# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CROSS & BENNETT, L.L.C. | **CONSOLIDATED WITH**<br>**Civil Case No. 12-11632-RWZ** |
| Plaintiffs, | **Leave to file granted on 11/1/12** |
| v. | |
| GREGORY W. THORPE and<br>BLAIR HAMRICK | |
| Defendants. | |

## CROSS & BENNETT, L.L.C.'S COMPLAINT IN INTERVENTION

### INTRODUCTION

1.     On July 2, 2012, the Department of Justice ("DOJ") announced that
GlaxoSmithKline ("GSK") had agreed to plead guilty and pay *$3 billion* to resolve this
consolidated civil matter and related criminal liability arising from GSK's unlawful promotion of
certain prescription drugs, its failure to report certain safety data, and false price reporting
practices.

2.     Relators Gregory W. Thorpe ("Thorpe") and Blair Hamrick ("Hamrick") were
represented by Cross & Bennett, L.L.C. ("Cross & Bennett") in connection with this matter from
November 2002 into November 2009.  Cross & Bennett agreed to represent Thorpe and Hamrick
almost 10 years ago, when liability arising from the off-label promotion of drugs was unsettled
and any recovery was far from certain.  As Thorpe and Hamrick's present *qui tam* counsel,
Kenney & McCafferty, P.C. ("Kenney & McCafferty"), recognized in a July 2, 2012 press

release, this was "among the very first *qui tam* suits filed against a pharmaceutical company involving allegations of off-label promotion."

3.     Cross & Bennett filed the relevant *qui tam* complaint in Colorado in January 2003.   It was this filing that first alerted the government to fraud by GSK.   For seven years, Cross & Bennett worked tirelessly on behalf of Thorpe and Hamrick with the United States, the various states, and counsel for other relators to build the case against GSK.

4.     Late in 2009, by which time a large settlement appeared probable, Thorpe and Hamrick began efforts to bully Cross & Bennett into reducing its contingency fee.   By this time, Cross & Bennett had completed the vast majority of the work necessary to support the *qui tam* complaints that ultimately resulted in the historic recovery referenced above.   In fact, DOJ had already begun settlement negotiations with GSK.   When Cross & Bennett refused to renegotiate its fee agreement, Thorpe and Hamrick began to complain about the quality of Cross & Bennett's legal work.

5.     Contrary to doing substandard legal work, Cross & Bennett, through years of dedicated representation, was instrumental in achieving the extraordinary results which will now leave Thorpe and Hamrick very wealthy men.   Indeed, GSK's settlement is *the largest combined federal and state health care fraud recovery in a single settlement in the history of the United States and Thorpe and Hamrick will receive relator payments totaling almost 75 million dollars.*   This substantial settlement resulted from Cross & Bennett's working as a team with the government attorneys assigned to this case, particularly A.U.S.A. Sara Bloom from Boston, A.U.S.A. Edwin Winstead from Colorado, and Andy Mao and Patrick Jasperse from DOJ in Washington, D.C., as well as attorney Erika Kelton and her associate attorneys, Sam Brown and Erin Krimbill, who represented relators Burke and Gerahty.

6.      Thorpe and Hamrick's present *qui tam* law firm, Kenney & McCafferty, began its representation in January of 2010 by which time DOJ and GSK were negotiating a settlement and the case was in its final stages.  This was less than a year before the announcement of intervention by the United States and long after the bulk of the work that resulted in the recovery had already been done by Cross & Bennett.  On information and belief, Kenney & McCafferty agreed with Thorpe and Hamrick to a 10% contingent fee.

7.      Thorpe and Hamrick have taken the position before this Court that Cross & Bennett is not entitled to *any* legal fees and are thereby seeking to reduce their total attorney's fees from a contractually-set and industry-accepted 40% to only 10%.  Quite simply, Thorpe and Hamrick ask this Court to bless their unjust enrichment at the expense of the attorneys who made their recovery possible.

8.      This effort to deprive Cross & Bennett of a well-earned fee implicates important public policy issues concerning the leverage afforded successful *qui tam* relators, the stability and enforceability of contingent fee arrangements and the importance of compensating counsel who risk taking on representations on a contingent fee basis where recovery is uncertain, but significant public health, safety, and fiscal interests are at stake.

9.      Cross & Bennett hereby seeks to protect, enforce, and reduce to judgment its Colorado attorney's lien on Thorpe and Hamrick's share of the settlement, and further, asks this Court to determine the measure of legal fees and disbursements due and owing to Cross & Bennett for its remarkably successful, seven year representation of Thorpe and Hamrick.  The Court should not permit Thorpe and Hamrick to be unjustly enriched at the expense of Cross & Bennett by allowing them to keep fees earned by Cross & Bennett and thereby limiting their fees in a high risk contingent fee case to only 10%.

## PARTIES

12.     Cross & Bennett is a law firm organized as a Colorado limited liability company with a usual place of business in Colorado Springs, Colorado.

13.     Cross & Bennett employs Keith F. Cross, Esq. ("Cross") and Joseph F. Bennett, Esq. ("Bennett").

14.     Cross has been a trial lawyer for over 30 years.  He has focused his practice on all aspects of employment law and over the past decade has expanded his concentration to include the False Claims Act, health care fraud, defense contractor fraud, and pharmaceutical fraud.  He is licensed to practice in all courts of the state of Colorado, the federal district court for the District of Colorado, the Tenth Circuit Court of Appeals, the Fifth Circuit Court of Appeals and the United States Supreme Court.  Cross has also handled, with associate counsel, cases in California, Louisiana, and Texas.   He formerly served as a Judicial District Attorney and Public Prosecutor.  Cross received a J.D. from the University of Colorado School of Law in 1978, an M.A. from Ohio State University in 1974, and a B.A. (*Magna Cum Laude*) from the University of Massachusetts in 1972.

15.     Bennett has practiced law for 26 years, beginning his legal career as a public prosecutor in Colorado's Ninth and Fifth Judicial Districts.  Since moving to Colorado Springs in 1990, Bennett has been primarily involved in civil and personal injury litigation.  He presently represents patients and their families in medical malpractice cases, major personal injury lawsuits, and wrongful death cases. Bennett received a J.D. from the University of Colorado School of Law in 1986 and a B.A. (*Magna Cum Laude*) from the University of Massachusetts in 1983.

16.     Thorpe is an individual who, on information and belief, resides at 258 Arrowleaf Lane, Mountain Home, AR  72652.

17.     Hamrick is an individual who, on information and belief, resides at 4509 Watrous Avenue, Tampa, FL  33629.

## JURISDICTION

18.     Jurisdiction in this Court is invoked based on 28 U.S.C. § 1367, 28 USC § 1332, and under Rule 24 of the Federal Rules of Civil Procedure.

## FACTS[1]

19.     On October 3, 2001, Thorpe first met with Cross to discuss issues related to Thorpe's employment at GSK, including purported violations by GSK of the Age Discrimination and Employment Act of 1967.

20.     Between October 2001 and August 2002, Cross & Bennett, through Cross, advised Thorpe on employment issues, including certain disciplinary actions that GSK had taken against him.  Among other things, Cross sent a letter to GSK concerning Thorpe's employment issues, which raised violations of off-label marketing regulations.  Significantly, that letter was later used by the United States as an exhibit to its Complaint in Intervention, filed on October 26, 2011.

21.     In Spring of 2002, Thorpe and Cross first discussed a *qui tam* action under the False Claims Act against GSK.  After initially contacting Cross concerning the potential False Claims Act case, Thorpe was told by Cross that he may not have sufficient time to handle this case.  Then unbeknownst to Cross, Thorpe submitted some of the details of his case to Phillips &

---

[1] The following recitation highlights significant work performed by Cross & Bennett attorneys on behalf of Thorpe and Hamrick and important events over the course of the engagement.  It is not intended, nor should it be construed to be, an exhaustive list of all work by Cross & Bennett.

Cohen, a prominent, national whistleblower firm located in Washington, D.C. in the hope that the firm would represent him, Phillips & Cohen declined to represent Thorpe.  Thereafter, Cross agreed to represent Thorpe in the False Claims Act case.

22.     Throughout the summer and fall of 2002, Cross researched medically accepted indications and payment for covered drugs, among other relevant topics.  At that time, there was little authority or precedent regarding *qui tam* actions arising from off-label marketing, so Cross was largely breaking new ground as he formulated, researched and prepared this suit.

23.     In August 2002, Thorpe first indicated that he might want to bring his friend, Hamrick, on as a co-relator.  At that time, Hamrick was still working for GSK, while Thorpe had signed an enhanced separation agreement in August of 2002, resigning from GSK in exchange for "an unusually favorable severance package . . . ."  (*See* paragraph 139 of Government's Complaint in Intervention in this case).

24.     In November 2002, Cross met with Hamrick for the first time and on November 27, 2002, Cross & Bennett, Thorpe, and Hamrick executed a Contingent Fee Agreement to represent Thorpe and Hamrick in the False Claims Act case against GSK.  Since Thorpe had released GSK on his personal claims in his enhanced separation agreement, there was no agreement to represent Thorpe on his potential personal retaliation claims.

25.     Throughout December 2002, Cross conducted factual and legal research on issues relevant to the prospective *qui tam* action, including: law and regulatory authority relating to the off-label marketing of prescription drugs; the relationship of the drug compendia to off-label marketing; the approved uses for Imitrex, Lamictal, Wellbutrin, Lotronex, Flovent, and Advair; the use of Wellbutrin for treatment of pediatric ADHD; the use of Lamictal in the treatment of

bipolar disorder; the use of Imitrex for pediatric Migraine; the use of "Medical Scientists" to market off-label; and the use of Advair for the treatment of COPD.

26.     During that time, Cross quickly and efficiently reviewed the documents being provided by Thorpe and Hamrick and drafted a *qui tam* complaint alleging that GSK had violated the federal False Claims Act by illegally marketing its prescription drugs to the Medicaid and Tricare programs.

27.     On January 3, 2003, Cross filed the *qui tam* complaint under seal against GSK in U.S. District Court for the District of Colorado, 1:03-cv-00008-WYD-BNBC.  Due to Cross' diligence, Thorpe and Hamrick were the first relators to file such an action, a critically important status under federal law.

28.     Cross reviewed documents from Thorpe and Hamrick throughout 2003 and conducted his own research concerning, *inter alia*: Imitrex, Wellbutrin, Advair, Lotronex, and Lamictal; marketing and sales training on various drugs; top prescription writers for different prescriptions and symptoms; the wining and dining of physicians; methods of targeting high prescribers; GSK's minority marketing; Canadian drug sales; drug sampling; Medline; FDA approval of drugs; and medication used to treat bipolar disorders. During this time, Cross was in almost daily contact with Thorpe and Hamrick and in frequent contact with Edwin Winstead, Esq. ("Winstead") of the United States Attorney's Office ("USAO") in Denver.  Cross met with Winstead and delivered boxes of relevant documents to him.  Cross also transmitted documents and supplemental memoranda to Andrew Mao, Esq. ("Mao") and other attorneys at the DOJ in Washington, D.C.

29.     In early 2003, Cross prepared himself and Thorpe and Hamrick for a significant meeting with representatives from the DOJ, the USAO, the Federal Bureau of Investigation

("FBI"), the Office of the Inspector General for the U.S. Department of Health of Human Services, and the Colorado Medicare Fraud Control Unit. The meeting took place on March 3, 2003 in Denver, lasted several hours, and included interviews of both Thorpe and Hamrick. The various government representatives present seemed very interested in the allegations made in the *qui tam* complaint and appeared to be relying upon the information provided by Thorpe and Hamrick and the legal analysis of Cross & Bennett.

30.     After this meeting, through April and May of 2003, Cross continued to confer with Thorpe and Hamrick and to gather and review documents. During that time, Cross focused on: Lamictal for Bipolar off-label; off-label presentations about the use of Advair for COPD; the FDA Adverse Event Reporting Program; HHS Guidance on Financial Interests in Research; the use of Wellbutrin for weight loss; and Paxil, Valtrex, and Advair formulary information and promotion.

31.     On July 18, 2003, Michael Theis, Esq. ("Theis"), U.S. Attorney for the District of Colorado, and Winstead called Cross to inform him of a related case that had been later filed in the District of Massachusetts by Erika Kelton, Esq. ("Kelton") of Phillips & Cohen. That case was brought by GSK employees who were much higher-level than Thorpe and Hamrick, with a significantly larger database of documents and potentially better inside knowledge of GSK's management. As a result of their broader access to information and documents, their complaint contained allegations that expanded the geographic scope and substance of GSK's misconduct, in effect expanding a regional case to a national case. Theis and Winstead encouraged Cross to work out an agreement with Phillips & Cohen whereby Thorpe, Hamrick, and the Phillips & Cohen relators would pool their knowledge and resources to advance both the Colorado and Massachusetts *qui tam* matters.

8

32.     In the fall of 2003, Cross provided the government with a list of prominent GSK paid speakers who were likely to be making off-label presentations to physicians.

33.     Between August 2003 and January 2004, Cross, in close concert with Thorpe and Hamrick, negotiated an agreement with Phillips & Cohen.  Thorpe initially wanted to agree to a 2/3 to 1/3 split, but ultimately decided that he would agree to a 50-50 split as long as Phillips and Cohen had two, not just one, higher level GSK employees as relators.  Hamrick also agreed. The agreement, executed by Thorpe, Hamrick and the Phillips & Cohen relators, pledged, *inter alia*, that they would work together to litigate their respective cases and to share "all monies that are awarded as relator share awards in each of the Colorado and Massachusetts *qui tam* actions, no matter what allegations form the basis for the Governments' recovery(ies) and ultimate award(s)."  Thorpe and Hamrick were kept informed of the settlement negotiations throughout and consented to the agreement with full disclosure of the potential risks and benefits.

34.     During the second half of 2003, Cross was in regular communication with government agents, including officials at the U.S. Food and Drug Administration ("FDA"), who were working on the ongoing investigation of GSK.  Cross provided the government with research and documents concerning: pediatric migraines and Imitrex; Paxil; top off-label speakers; and numerous other subjects related to the off-label promotion of drugs documented in Thorpe and Hamrick's initial *qui tam* complaint.

35.     In January 2004, the Colorado USAO issued its first subpoena to GSK, based largely on information provided by Thorpe and Hamrick and the Phillips & Cohen relators.  GSK began producing documents pursuant to the subpoena on a "rolling" basis.  According to Winstead, the initial production totaled between one and two million documents.  GSK produced

more documents pursuant to the subpoena each year thereafter.  As of 2009, the federal

government had accumulated between 15 and 17 million documents from GSK.

36.     On February 4, 2004, the government notified Cross of a complaint filed in 2000

prior to Thorpe and Hamrick's complaint.  Cross, in close concert with Thorpe, Hamrick, and

Kelton engaged in protracted negotiations with that plaintiff's counsel concerning his entitlement

to any percentage of the relator's share.  Ultimately, the parties reached agreement in July 2004

to share a percentage of any recovery with that plaintiff, who then dismissed his case with

prejudice.

37.     Cross continued throughout 2004 to receive and evaluate information forwarded

by Hamrick on various drug issues, including: company initiatives related to fraudulent activity,

such as the destruction and replacement of notebook computers for all GSK marketing

representatives and GSK's new "Write-Right" program; new speaker programs; GSK's FaxBack

documents; and literature and studies it was providing to physicians through its marketing

representatives.

38.     Also throughout 2004, Cross was in almost daily contact with his clients and in

frequent contact with the federal and state governments.  Additionally, Cross was sharing

information back and forth with Kelton, pursuant to the agreement between their clients.

39.     From January through April 2005, Cross devoted much of his time to preparing

the First Amended Complaint, which was filed on April 27, 2005.  The First Amended

Complaint included retaliation and termination claims on behalf of Thorpe and Hamrick.

Although the value of these claims was not clear, Cross felt that the retaliatory conduct by GSK

against its former employees would help spur the government to action.  At the time, Thorpe told

Cross that he was very happy with the First Amended Complaint.

10

40.     From May 2005 through December 2005, Cross continued to confer with Winstead and Kelton concerning the case. During 2006, at the request of Thorpe and Hamrick (who were increasingly distressed by the pace of the government's investigation), Cross spoke with Kelton and Winstead about advancing the case.  Cross then reached out to state Medicaid Fraud Control Units in Texas and Virginia in an effort to convince them to independently pursue state claims.  Cross also explored the possibility of electronically mining the millions of documents produced by GSK in an effort to assist the government in its investigation and prosecution of the False Claims Act case.

41.     Cross & Bennett and Thorpe and Hamrick executed a Contingent Fee Agreement dated February 1, 2007, which superseded the Contingent Fee Agreement executed on November 27, 2002.  The February 1, 2007 Agreement provided that Cross & Bennett's fees would be 40% of the gross amount collected.  (*See* **Exhibit 1** hereto[2]).  Further, Cross & Bennett agreed to advance money for costs related to the matter, which, in the event of settlement or judgment, would be reimbursed in full.

42.     The February 1, 2007 Agreement also provided that, in the event that Thorpe and Hamrick terminated the agreement,

> without wrongful conduct by the attorneys which would cause the attorneys to forfeit any fee, or if the attorneys justifiably withdraw from the representation of the clients, the attorneys may ask the court or other tribunal to order the clients to pay the attorneys a fee based upon the reasonable value of the services provided by the attorneys. If the attorneys and the clients cannot agree how the attorneys are to be compensated in this circumstance, the attorneys will request the court or other tribunal to determine: (1) if the clients have been unfairly or unjustly enriched if the clients do not pay a fee to the attorneys; and (2) the amount of the fee owed, taking into account the nature and complexity of the clients' case, the time and skill devoted to the clients' case by the attorneys, and the benefit obtained by the clients as a result of the attorneys' efforts. Any such fee shall be

---

[2] Filed with this Complaint are Exhibits 1, 5, and 9-10 thereto.  Cross & Bennett will file Exhibits 2-4, 6-8, and 11 under seal, consistent with the November 1, 2012 order of this Court.

payable only out of the gross amount collected by or on behalf of the clients and the amount of such fee shall not be greater than the fee that would have been earned by the attorneys if the contingency described in this contingent fee agreement had occurred.

43.     Throughout 2007, Cross continued to send additional information to the federal government and, in particular, documents and data directly to Sara Bloom, Esq. ("Bloom") of the Boston USAO and Mao of DOJ.  Cross researched and forwarded information concerning "Operation Hustle," including tapes and documents; and Imitrex, Wellbutrin, and Advair.  Cross also responded to inquiries by Winstead with regard to the off-label use of Lamictal.

44.     In January 2008, Cross traveled with Thorpe and Hamrick to Boston for meetings with Bloom and FBI agents.  Over the course of the trip, Thorpe and Hamrick engaged in a series of interviews and made sworn statements.  Thereafter, Cross responded to additional requests for information from Bloom, the FBI, and Mao on subjects including Valtrex, Imitrex, and Seratonin syndrome.

45.     Cross also drafted a Second Amended Complaint to correct minor errors in the first and to add states that had recently adopted *qui tam* statutes.  Cross filed the Second Amended Complaint on July 11, 2008.During July 2008, Cross fielded requests for information from Patrick Jasperse, Esq. ("Jasperse") of the DOJ Office of Consumer Litigation, concerning the role of GSK's attorneys and compliance officers in off-label marketing.

46.     During this same time, Cross worked with Kelton to convince the DOJ to permit Cross and Kelton to data mine documents that GSK had produced in response to the government subpoena in order to help build the case against GSK on behalf of their clients.

47.     To facilitate the data mining, Cross purchased a notebook computer and data mining software and had it delivered to the office of the United States Attorney in Boston.  Cross then performed data mining in Boston during the second and last weeks of October 2008.

48.     Through the rest of 2008, Cross continued to research and review medical literature relating to: Advair; spirometry; asthma and COPD; and the clinical trials that GSK used to obtain approval for Advair.  He also purchased texts relating to statistics and clinical trials; familiarized himself with clinical trial terminology; and researched trials for an ICS/LABA combination drug that were eventually terminated by GSK.  In November 2008, Cross researched off-label issues relating to Lamictal for Winstead and sent him information that he had requested concerning certain former GSK employees.

49.     After conducting extensive research and data mining with Kelton and her associates, in November, 2008, Cross prepared a detailed analysis for the government of the off-label promotion of Advair for disease states not indicated on the FDA label, particularly mild intermittent asthma.  His analysis linked his research of marketing ploys used by GSK in promoting Advair to off-label pediatric marketing, manipulation of clinical trials, and use of misleading journal literature in GSK marketing based on GSK marketing training manuals obtained from Hamrick.  This research helped form the foundation for the most significant part of the government's case against GSK: the off-label promotion of Advair for first-line treatment of mild, intermittent asthma.

50.     In December 2008, Cross provided additional Lamictal research to Winstead and traveled to Boston to meet with Bloom and Kelton and continue data mining.

51.     Towards the end of December 2008, Cross drafted a Third Amended Complaint, adding allegations concerning, *inter alia*, Paxil, Advair, and steroid sparing in asthma treatment. Cross filed the Third Amended Complaint on January 2, 2009.

52.     Cross continued to send additional research to the government throughout the month of January and, from January 27-31, 2009, conducted additional data mining in Boston with Kelton and Bloom.

53.     Between February 2009 and April 2009, Cross researched whether GSK had misrepresented certain study results on the efficacy of Advair for COPD and side effects.

54.     Cross obtained a partial lifting of the court's seal and sent certified letters to the states named in the amended complaints in March 2009.   During the course of the representation of Thorpe and Hamrick, Cross was in regular contact with state Medicaid Fraud Control Unit attorneys and paralegals from various states, including Virginia, Texas, Florida,  and New Hampshire.  Cross was informed that the states had formed a joint task force, at that time led by the Ohio Medicaid Fraud Control Unit, and that none of the states intended to try to prosecute any of the claims against GSK separately.

55.     From May 16 to 20, 2009, Cross again traveled to Boston, conducted data mining, and met with Kelton and Bloom.

56.     Cross traveled to Boston from June 13 to 18, 2009 for data mining and to meet with Kelton, Bloom and DOJ investigators.  These meetings focused on educating Bloom and DOJ about the significant dangers of off-label Advair marketing.

57.     On August 21, 2009, Cross sent a detailed analysis to the DOJ of GSK's misuse of medical literature in its off-label marketing of Advair, along with an analysis of the National Asthma Education and Prevention Program classification of asthma severity to demonstrate how GSK marketed Advair off-label nationwide.  Cross and Bennett traveled to Boston from August 26 to 30, 2009 for data mining and to again meet with Bloom and Winstead.  During that time, Kelton, with the assistance of Cross, gave a presentation on Advair for mild asthma.  The

presentation juxtaposed evidence that GSK officials had assured the FDA that Advair would *never* be used for mild, intermittent asthma or as a first-line treatment for asthma, with documents evidencing GSK's program to market Advair nationwide for exactly these uses.

58.     In September 2009, Cross continued to research and share information on Advair with Kelton and her associates in anticipation of a meeting in Washington with DOJ.  The meeting was being held for the purpose of the relators presenting to DOJ a well-supported argument that the Advair case alone was worth as much as $1.5 billion.

59.     On September 9, 2009, Thorpe sent an email to Cross telling him that he had identified a new potential "associate" attorney who was willing to step in to "help us finalize all of the important issues and get the settlement WE deserve…and nobody else."  According to the email, the new attorney was also willing to renegotiate the agreement with the Phillips & Cohen relators to a more "reasonable 25-30%."  (*See* **Exhibit 2** hereto).

60.     From September 17 to 19, 2009, Cross attended the meeting in Washington, D.C. with all of the government representatives interested in the case.  Cross and Kelton presented their arguments that the Advair off-label case alone was worth $1.5 billion.  (This was in addition to the amount of approximately $400 million that Bloom had already indicated, in a previous meeting with Cross, would be due from GSK's illegal marketing practices involving other GSK drugs.)

61.     On September 22, 2009, Thorpe sent an e-mail to Cross again discussing proposed new associate counsel, saying "[w]e have a proposed sharing agreement, which we think is fair and equitable."  He also admits that new counsel "respects how far the case has gotten."  (*See* **Exhibit 3** hereto).

62.     On September 22, 2009, Cross sent Thorpe and Hamrick a letter declining to amend the fee agreement in the manner proposed.  (*See* **Exhibit 4** hereto).  Cross also told Thorpe and Hamrick that, although he did not see any need for associate counsel on the case, if they wanted to retain associate counsel he would be willing to work with him, provided that this would not affect the fee agreement already in place.  Cross refused to accede to his client's transparent efforts to reduce their liability for legal fees by alleging specious claims of ethical violations and malpractice.

63.     The next day, Thorpe forwarded the proposed agreement which provided, *inter alia*, that Cross & Bennett would receive, at most, 24% of any award to relators and the "associate counsel" would receive 8%.  This would have had the effect of reducing Thorpe and Hamrick's overall contingency payout to 32%.  The new proposed agreement further provided that Thorpe would receive 39% of any award while Hamrick would receive only 29%.  Thorpe and Hamrick also threatened to bring malpractice claims against Cross & Bennett, but offered to "void" such claims if Cross & Bennett agreed to all terms of the proposal, including substantially discounting their fees.  (*See* **Exhibit 5** hereto).  Thorpe and Hamrick had not raised the issue of decreasing their attorneys' fees prior to a significant recovery looking reasonably certain.

64.     Cross prepared the Fourth Amended Complaint, which he filed on October 2, 2009 and which set forth new, detailed allegations concerning Advair.

65.     On October 9, 2009, Thorpe sent Cross an email stating "[a]s you said to us...How much money do you need. Well, we want every penny we deserve at this stage….In the end, you may get nothing and I am not sure you deserve anything after talking to other counsel and how this matter was handled since I walked into your office. On the other hand you may get

something, but I will have the money to fight you as long as you want or Counsel willing to do it." (*See* **Exhibit 6** hereto).

66.     On October 21, 2009, Thorpe sent a termination letter to Cross by facsimile.

67.     On October 22, 2009, Thorpe sent Cross another email in which he said, "You need to think about your situation, as if any more happens that I deem detrimental to our case..one thing-you will have done it to yourself. You hold your own future as to how you behave, post termination. My legal options are endless, and could be highly detrimental to your future in the legal profession. (not just my opinion)…..Please do not let your emotions ruin your career, you have more money than you need right now...as you always told us "how much do you need?" (*See* **Exhibit 7** hereto).

68.     On October 30, 2009, Thorpe sent an email to Cross in which he stated "Please be aware of what I said, that if you did one more thing that was not only unbalanced as to your mental state, as well as VIOLATING my attorney client privilege, you would trigger a malpractice suit and we would attempt to deny you anything in the matter, up to and including any attorney fees and costs. You blew your mediation chance, in other words, and furthered the malpractice issues….Get over it, you are finished and you did it to yourself." (*See* **Exhibit 8** hereto).  The October 2009 emails described herein, were transparent attempts by Thorpe to coerce Cross & Bennett into waiving its claim for fees.

69.     On November 11, 2009, Thorpe and Hamrick, as promised, did, in fact, file a formal grievance with the Colorado Supreme Court's Office of Regulatory Counsel, which investigates and prosecutes attorney discipline matters in that state, alleging that Cross had committed malpractice and various ethical violations.

70.     On November 23, 2009, the Office of Disciplinary Counsel informed Thorpe and Hamrick that it had reviewed the allegations of misconduct and "determined that the information you provided *does not set forth facts, which if proven, would constitute grounds for the imposition of discipline* by the offices of the Supreme Court of Colorado.  Therefore we are closing this matter and will take no further action on your request."  (*See* **Exhibit 9** hereto).

71.     On November 12, 2009, Cross & Bennett filed a Notice of Attorney's Lien in the Colorado action.  (*See* **Exhibit 10** hereto).  The Attorney's Lien claimed a lien upon a portion of all monies, properties, choses in action, claims and demands in suit, upon any property which may be awarded to the Thorpe and Hamrick in this matter and upon any and all Relator shares, regardless of the source of those shares, and upon any money due to Thorpe and Hamrick in the hands of GSK, the United States of America, the Department of Justice, and the states of California, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Nevada, New Hampshire, New Jersey, New Mexico, New York, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Minnesota, North Carolina and Wisconsin, and the District of Columbia, and any other state that is a participant in the settlement or judgment in the instant case, or in the currently sealed case of *United States ex rel. Gerahty* in the United States District Court for the District of Massachusetts, or in any other sealed or unsealed *c*ase against Defendants arising from or related to the same causes of action.

72.     In November 2009, Thorpe and Hamrick retained Marcella Auerbach, Esq., Kenneth Nolan, Esq., and William Martinez, Esq.  In January 2010, Auerbach and Nolan withdrew from representation of Thorpe and Hamrick and were replaced by the law firm of Kenney & McCafferty.

73.     From November 2009 through April 2010, Cross & Bennett spent hundreds of hours Bates stamping and forwarding their litigation file, including documents, exhibits, and emails to Thorpe and Hamrick's new counsel.

74.     On information and belief, Kenney & McCafferty agreed to a 10% share of Thorpe and Hamrick's recovery, and thus will receive approximately $7.439 million for work done in the comparatively short period of time it represented Thorpe and Hamrick.

75.     The United States filed a Notice of Intervention on January 14, 2011.

76.     On March 7, 2011, the Colorado case (1:03-cv-00008-WYD-BNBC) was transferred to the United States District Court for the District of Massachusetts and assigned case number 1:11-cv-10398-RWZ.  On April 5, 2011, the Court consolidated 1:11-cv-10398-RWZ into case 1:03-cv-10641-RWZ.

77.     The United States filed its Complaint in Intervention on October 26, 2011.

78.     On November 3, 2011, GSK announced an agreement in principle to pay the United States $3 billion in a global settlement of all illegal marketing claims.

79.     Again, on July 2, 2012, the Department of Justice announced that GSK had agreed to plead guilty and pay $3 billion to resolve its criminal and civil liability arising from, *inter alia*, the company's unlawful promotion of certain prescription drugs.

80.     Of the $1.017 billion civil settlement, the overwhelming majority -- $686,049,841 -- was attributed to the off-label marketing of Advair.  Recovery for that conduct was due, in significant part, to the hard work of Cross, working as a team with Bloom, Winstead, Mao, Jasperse, Kelton, and her associates.  This was a theory of liability identified, researched, and largely substantiated by the legal team and its work mining all of the available data.  Thorpe and Hamrick would not have realized such an extraordinary recovery without Cross' efforts.  Thorpe

provided almost no information relevant to off-label marketing of Advair for mild intermittent asthma, and Hamrick did provide valuable information in support of the theory, but only after being asked to do so by Cross as the theory was being developed.

81.     At all times, Cross & Bennett acted carefully and prudently to protect the interests of both Thorpe and Hamrick.  This is evidenced by Cross & Bennett's retention of special ethics counsel to assist them in dealing with Thorpe and Hamrick, who became progressively more difficult as time went on.  Cross also advised Thorpe and Hamrick to retain separate counsel to resolve a dispute that they were having between themselves as a result of Thorpe wanting to increase his percentage share of any recovery at the expense of Hamrick.  Further, in October 2009, Cross told them to retain independent counsel if they wanted to allege misconduct by Cross & Bennett.  (*See* **Exhibit 11** hereto).

82.     Even after the termination of Cross & Bennett, Cross continued to assist new counsel, Kenney & McCafferty, when requested.  At the same time this assistance was being supplied, Thorpe and Hamrick's other counsel, William Leonard, Esq. was threatening malpractice claims and telling counsel for Cross & Bennett that their Attorney's Lien was worthless.

83.     On information and belief, federal and state share payments to Thorpe and Hamrick are imminent.  The federal share payment due to Thorpe and Hamrick (excluding monies owed to the Phillips & Cohen relators) is approximately $63,562,195 and the state share is approximately $10,834,696.  Cross & Bennett asserts a lien upon 40% of the federal share, the state share, and any other recovery by Thorpe and Hamrick in this action.

84.     Cross & Bennett calculates that its attorneys worked thousands of hours on behalf of Thorpe and Hamrick and that it incurred over $34,064.43 in unreimbursed expenses.

85.    Further reflecting the volume of work performed by Cross & Bennett on behalf of Thorpe and Hamrick and the intensity of the attorney-client relationship are Cross & Bennett's litigation files, which included more than 42,000 Bates-numbered pages and 4,750 email messages to and from these clients during the period that Cross & Bennett represented them.

## COUNT I – QUANTUM MERUIT (UNJUST ENRICHMENT)

86.    Cross & Bennett repeats and incorporates by reference the allegations contained in paragraphs 1 through 85 above.

87.    By providing legal services to Thorpe and Hamrick from November 2002 through November 2009, Cross & Bennett conferred a benefit upon Thorpe and Hamrick which was appreciated and accepted by Thorpe and Hamrick under such circumstances that it would be inequitable for the benefit to be retained without payment of its value.

## REQUESTED RELIEF

WHEREFORE, Cross & Bennett requests that the Court:

A.  Order that, pursuant to the Attorney's Lien, 40% of Thorpe and Hamrick's federal and state recoveries, and any other monies subsequently recovered by Thorpe and Hamrick in this action, be deposited into the Registry of the Court and not released until further order of this Court;

B.  Order that this matter be handled on an expedited basis given that Cross & Bennett has waited  almost 10 years for payment of attorney's fees and reimbursement of expenses;

C.  Determine the measure of legal fees and disbursements due and owing to Cross & Bennett, pursuant to the Attorney's Lien, for its representation of Thorpe and Hamrick;

D.  Reduce Cross & Bennett's Attorney's Lien to Judgment; and

E.  Award Cross & Bennett any additional relief that this Court deems just and proper.

Dated:  November 9, 2012                    Respectfully submitted,

                                           CROSS & BENNETT, L.L.C.

                                           /s/ Allison D. Burroughs
                                           Allison D. Burroughs (BBO # 609346)
                                           Benjamin L. Mack (BBO # 661590)
                                           NUTTER, McCLENNEN & FISH, LLP
                                           155 Seaport Boulevard
                                           Boston, MA  02110
                                           (617) 439-2775
                                           aburroughs@nutter.com
                                           bmack@nutter.com

## CERTIFICATE OF SERVICE

        I hereby certify that, on November 9, 2012, this document (filed through the ECF system) will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated:  November 9, 2012                    /s/ Allison D. Burroughs