UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GREGORY THORPE and
BLAIR HAMRICK,

Plaintiffs,

v.

KEITH F. CROSS,
JOSEPH F. BENNETT and
CROSS & BENNETT L.L.C.,

Defendants.

C.A. NO.1:12-cv-11632-RWZ

## FIRST AMENDED ANSWER OF DEFENDANTS KEITH F. CROSS, JOSEPH F. BENNETT AND CROSS & BENNETT L.L.C. TO THE PLAINTIFFS' COMPLAINT

The Defendants, Keith F. Cross ("Cross"), Joseph F. Bennett ("Bennett") and Cross &

Bennett L.L.C. ("Cross & Bennett") (collectively, the "Defendants") answer the Plaintiffs'

Complaint as follows.  The Defendants deny each and every allegation not specifically admitted.

### FIRST DEFENSE

1.     The Defendants admit the allegations contained in Paragraphs 2, 6, 8, 14, 18, 20,

21, 22, 23, 26, 28, 29, 30, 31, 36, 37, 43, 56, 57, 60, 61, 69, 70, 71, 81, 92, 132, 139, 144, 154,

157, 169, 170 and 172 of the Complaint; deny the allegations contained in Paragraphs 5, 9, 35,

38, 49, 50, 51, 52, 54, 55, 58, 59, 64, 65, 66, 67, 73, 74, 75, 83, 84, 87, 88, 91, 100, 101, 103,

106, 108, 109, 110, 111, 113, 114, 115, 116, 117, 119, 120, 121, 122, 137, 140, 141, 148, 149,

152, 158, 159, 160, 163, 164, 165, 173, 174, 176, 177, 179, 180, 181, 183, 186, 187, 188, 189,

190, 192, 193, 194, 197, 198, 199, 200, 202, 203 and 204 of the Complaint; and are without

knowledge or information sufficient to form a belief as to the truth of the allegations contained in

Paragraphs 12, 13, 46, 47, 68, 76, 77 and 146 of the Complaint.

2.      In answering Paragraph 1 of the Complaint, the Defendants admit that lawyers, including lawyers for the Government and other relators, as well as the Defendants, ultimately obtained an extremely favorable result in a complex *qui tam* case against a large pharmaceuticals company from which the Plaintiffs have benefited and will benefit but deny the remaining allegations contained therein.

3.      In answering Paragraph 3 of the Complaint, the Defendants admit that Plaintiff Thorpe asked Cross for employment advice and if he would evaluate a *qui tam* lawsuit under the False Claims Act, that Cross told Thorpe that *qui tam* law was "complicated" and that Thorpe should not take his case to a "rookie" and that Cross handled Thorpe's case on a contingency fee basis but deny the remaining allegations contained therein.

4.      In answering Paragraphs 4, 16, 79, 80, 162 and 168 of the Complaint, the Defendants admit the first sentence but deny the second sentence.

5.      In answering Paragraph 7 of the Complaint, the Defendants admit that Cross & Bennett filed a Notice of Attorney's Lien in the District of Colorado on November 12, 2009, claiming 40% of the Plaintiffs' recovery in the FCA Case but deny the remaining allegations contained therein.

6.      Paragraphs 10, 11, 184, 206, 207 and 209 contain a purported description of the form of relief sought by the Plaintiffs to which no response by the Defendants is required. To the extent that a response is required, the Defendants deny that the Plaintiffs are entitled to the requested relief.

7.      In answering Paragraph 15 of the Complaint, the Defendants admit the allegations contained in the first three sentences but deny the allegations contained in the last sentence.

8.      In answering Paragraph 17 of the Complaint, the Defendants admit that this case is related to the FCA Case at C.A. No. 11-10398-NG-RWZ but deny that Cross filed a notice of attorney's lien in that case.

9.      In answering Paragraph 19 of the Complaint, the Defendants admit that venue is properly laid in the District of Massachusetts, that Cross rendered legal services in cooperation with an Assistant United States Attorney in Massachusetts who led the investigation into GlaxoSmithKline LLC's misconduct, that the settlement and settlement funds from which the relators' shares will be paid are subject to the jurisdiction of the District of Massachusetts in the FCA Case, and that the Notice of Attorney's Lien filed by Cross & Bennett in the FCA Case, which is the subject of this suit, is now before the District of Massachusetts but deny the remaining allegations contained therein.

10.      In answering Paragraphs 24 and 97 of the Complaint, the Defendants say that the statute speaks for itself and decline to adopt the Plaintiffs' characterization thereof.

11.      In answering Paragraph 25 of the Complaint, the Defendants say that the case cited therein speaks for itself and decline to adopt the Plaintiffs' characterization thereof.

12.      In answering Paragraph 27 of the Complaint, the Defendants admit that in some circumstances, if a first filed complaint fails to adequately allege a cause of action under the FCA and Federal Rule of Civil Procedure 9(b), a subsequent relator may challenge the first relator's right to the relator's share.

13.     In answering Paragraph 32 of the Complaint, the Defendants admit that Thorpe contacted Cross & Bennett in September 2001 concerning his employment issues but deny the remaining allegations contained therein.

14.     In answering Paragraph 33 of the Complaint, the Defendants admit that Cross represented Thorpe in connection with his employment dispute with GlaxoSmithKline LLC between October 2001 and August 2002 and in connection with employment-related claims which Thorpe included in his First Amended Complaint which was filed in the FCA Action in April 2005 but otherwise deny the allegations contained therein.

15.     In answering Paragraph 34 of the Complaint, the Defendants admit that Cross charged Thorpe $175.00 per hour for representation concerning employment matters between October 2001 and May 2002 but deny the remaining allegations contained therein.

16.     In answering Paragraph 39 of the Complaint, the Defendants admit that, between September 2001 and August 2002, Thorpe provided Cross with documents and that Thorpe and Cross discussed the possibility of bringing an FCA lawsuit against GSK, both orally and in writing, but deny the remaining allegations contained therein.

17.     In answering Paragraph 40 of the Complaint, the Defendants admit that, upon information and belief, Thorpe provided Cross with a handwritten letter discussing GlaxoSmithKline's off-label promotion of drugs and kickbacks to physicians on or about October 9, 2001.

18.     In answering Paragraph 41 of the Complaint, the Defendants admit that Thorpe sent emails to Cross on the dates cited in which he offered to provide Cross with information

4

purportedly substantiating his allegations that GlaxoSmithKline LLC was engaged in illegal activity but deny the remaining allegations contained therein.

19.     In answering Paragraph 42 of the Complaint, the Defendants admit that Cross sent the cited email on May 18, 2008 in response to an email sent to him by Thorpe on May 17, 2008 but deny the remaining allegations contained therein.

20.     In answering Paragraph 44 of the Complaint, the Defendants admit that Cross filed a 12 page complaint in the FCA Case on Thorpe's behalf on January 2, 2003 but deny the remaining allegations contained therein.

21.     In answering Paragraph 45 of the Complaint, the Defendants admit the second sentence but otherwise deny the allegations contained therein.

22.     In answering Paragraph 48 of the Complaint, the Defendants admit that, on March 21, 2002, Cross sent a letter on Thorpe's behalf to GlaxoSmithKline LLC's Regional Director of Human Resources, Carrie Rubright, but deny the remaining allegations contained therein.

23.     In answering Paragraph 53 of the Complaint, the Defendants deny that it initially was Cross' idea to add Hamrick as a co-relator but otherwise admit the allegations contained therein.

24.     In answering Paragraph 62 of the Complaint, the Defendants admit that Cross advised Thorpe that signing the severance agreement could, in certain circumstances, disqualify him from serving as a relator in a *qui tam* FCA claim against GSK but deny the remaining allegations contained therein.

25.     In answering Paragraph 63 of the Complaint, the Defendants admit that Cross downloaded the cited case on August 25, 2002 but deny the remaining allegations contained therein.

26.     In answering Paragraph 72 of the Complaint, the Defendants admit the allegations contained in the second sentence but deny the allegations contained in the first sentence.

27.     In answering Paragraph 78 of the Complaint, the Defendants admit that Thorpe and Hamrick signed a joint Contingent Fee Agreement retaining Cross to pursue an FCA case against GlaxoSmithKline LLC on November 27, 2002 but deny the remaining allegations contained therein.

28.     In answering Paragraph 82 of the Complaint, the Defendants admit that the Original Complaint did not include all of the drugs that GlaxoSmithKline LLC was marketing off-label, anti-kickback claims and state false claims act claims but deny the remaining allegations contained therein.

29.     In answering Paragraph 85 of the Complaint, the Defendants admit that Thorpe and/or Hamrick may have provided Cross with information regarding the off-label marketing of certain drugs, including Amerge, Paxil, Valtrex and Wellbutrin, which Cross did not include in the Original Complaint but affirmatively state that neither Thorpe nor Hamrick provided information sufficient to form a well plead complaint concerning the off-label marketing of those drugs.

30.     In answering Paragraph 86 of the Complaint, the Defendants deny the allegations contained in the first sentence and admit the allegations contained in the second sentence.

31.     In answering Paragraph 89 of the Complaint, the Defendants admit the second sentence but deny the remaining allegations contained therein.

32.     In answering Paragraph 90 of the Complaint, the Defendants are without knowledge or information sufficient to form a belief as to what Thorpe believed and what caused him to believe it and deny the remaining allegations contained therein.

33.     In answering Paragraph 93 of the Complaint, the Defendants admit that Cross filed an amended complaint in the FCA Action in April 2005 but deny the remaining allegations contained therein.

34.     In answering Paragraph 94 of the Complaint, the Defendants admit that the Original Complaint was filed in the District of Colorado but deny the remaining allegations contained therein.

35.     In answering Paragraph 95 of the Complaint, the Defendants state that they are without knowledge or information sufficient to form a belief as to the identity of the "second filer" and whether that "second filer" was represented by competent counsel or filed a case in the District of Massachusetts and deny the remaining allegations contained therein.

36.     In answering Paragraph 96 of the Complaint, the Defendants deny that Mike Theis informed Cross during the referenced telephone conference that the referenced complaint had been filed on April 7, 2003 but admit the remaining allegations contained therein.

37.     In answering Paragraph 98 of the Complaint, the Defendants admit that Cross sent Thorpe and Hamrick an email on July 18, 2003 that contained the cited quotation and that, as of that date, he had not yet seen a copy of the complaint prepared by Phillips & Cohen but deny the

remaining allegations contained therein and affirmatively state that Attorney Mike Theis had provided him with a summary of the complaint prepared by Phillips & Cohen on or about July 18, 2003.

38.     In answering Paragraph 99 of the Complaint, the Defendants admit that Cross made the quoted statements to Thorpe and Hamrick but decline to adopt the Plaintiffs' characterization thereof.

39.     In answering Paragraph 102 of the Complaint, the Defendants admit the allegations contained in the first two sentences but deny the allegations in the third sentence.

40.     In answering Paragraph 104 of the Complaint, the Defendants admit that Cross and Thorpe exchanged emails on July 21, 2003 and that they contained the quotation cited therein but decline to otherwise adopt the Plaintiffs' characterization of the cited email correspondence.

41.     In answering Paragraph 105 of the Complaint, the Defendants admit the allegations contained in the first sentence and that Cross sent the Plaintiffs an email on July 28, 2003 which contained the cited quotation but deny the remaining allegations contained therein.

42.     In answering Paragraph 107 of the Complaint, the Defendants admit that Cross made the quoted statements but decline to adopt the Plaintiffs' characterization thereof and deny the remaining allegations contained therein.

43.     In answering Paragraph 112 of the Complaint, the Defendants admit that the Plaintiffs entered into a 50-50 sharing agreement with relators represented by Phillips & Cohen in January 2004 but decline to adopt the Plaintiffs' characterization of that agreement.

44.     In answering Paragraph 118 of the Complaint, the Defendants state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence and whether and when Thorpe had asked Phillips & Cohen to evaluate his qui tam case against GSK, admit that Phillips & Cohen filed complaints covering some of the drugs referenced in the Original Complaint and deny the remaining allegations contained therein.

45.     In answering Paragraph 123 of the Complaint, the Defendants admit that CRPC Rule 1.5 concerns "Fees" and requires them to be reasonable but otherwise deny the allegations contained therein.

46.     In answering Paragraphs 124 and 125 of the Complaint, the Defendants admit that Cross sent Thorpe and Hamrick an email on the date referenced that contained the cited quotation but decline to adopt the Plaintiffs' characterization thereof.

47.     In answering Paragraph 126 of the Complaint, the Defendants admit the second sentence and deny the remaining allegations contained therein.

48.     In answering Paragraph 127 of the Complaint, the Defendants admit that Cross sent a CD containing Thorpe and Hamrick's initial document production to the DOJ on February 4, 2003 and that the CD was accompanied by a cover letter but decline to adopt the Plaintiffs' characterization of the cover letter.

49.     In answering Paragraph 128 of the Complaint, the Defendants admit that Thorpe and Cross made the referenced statements to each other on or about the date cited, state that

Thorpe and Hamrick's FCA complaint was later amended to include Paxil and deny the remaining allegations contained therein.

50.    In answering Paragraph 129 of the Complaint, the Defendants admit that relators represented by Phillips & Cohen filed a first amended complaint on June 10, 2003, admit the second sentence and deny the remaining allegations contained therein.

51.    In answering Paragraph 130 of the Complaint, the Defendants state that the quoted email speaks for itself and contains the quoted text in its unmodified form and that Cross received a first amended complaint from Phillips & Cohen on July 25, 2003 but otherwise deny the allegations therein.

52.    In answering Paragraph 131 of the Complaint, the Defendants state that the quoted email speaks for itself and otherwise admit the allegations contained therein.

53.    In answering Paragraph 133 of the Complaint, the Defendants admit that Cross did not file a first amended complaint on Thorpe and Hamrick's behalf prior to or on August 31, 2003 and that he sent an email to Thorpe and Hamrick on November 24, 2003 which included the quoted text but deny the remaining allegations contained therein.

54.    In answering Paragraph 134 of the Complaint, the Defendants deny the allegations contained in the first and second sentences and admit the allegations contained in the third sentence.

55.    In answering Paragraph 135 of the Complaint, the Defendants admit that Cross sent an email to Thorpe and Hamrick on November 24, 2003 which included the quoted text but decline to adopt the Plaintiffs' characterization thereof.

56.     In answering Paragraph 136 of the Complaint, the Defendants admit the first

sentence and that Cross made the quoted statement to Thorpe but otherwise deny the allegations

contained therein.

57.     In answering Paragraph 138 of the Complaint, the Defendants admit that, in the

months that followed the signing of the sharing agreement, Thorpe inquired about the status of

the amended complaint but deny the remaining allegations contained therein.

58.     In answering Paragraph 142 of the Complaint, the Defendants admit that Cross

filed an amended complaint on behalf of Thorpe and Hamrick on April 27, 2005, which was over

two years after the original complaint was filed, but otherwise deny the allegations contained

therein.

59.     In answering Paragraph 143 of the Complaint, the Defendants admit that the

United States agreed to let counsel to the relators mine the documents in the government's

investigatory file for data that could be used in the case against GSK, subject to a protective

order, but deny the remaining allegations contained therein.

60.     In answering Paragraph 145 of the Complaint, the Defendants admit that, in

March 2008, Cross informed Thorpe and Hamrick that they could not participate in mining the

Government's documents because the data-mining was limited to attorneys and that he would

not be permitted to share any of the confidential documents with them but deny the remaining

allegations contained therein.

61.     In answering Paragraph 147 of the Complaint, the Defendants deny the first

sentence and admit the second sentence with the qualification that, prior to Cross' discharge, the

United States had asserted an objection to individual relators signing the protective order and having access to confidential documents.

62.     In answering Paragraph 150 of the Complaint, the Defendants admit the allegations contained in the first sentence and are without knowledge or information as to the truth of the allegations contained in the second sentence.

63.     In answering Paragraph 151 of the Complaint, the Defendants admit that Thorpe communicated with Cross about GlaxoSmithKline LLC's alleged breaches of his severance agreement on September 20, 2002 and November 15, 2002 but decline to adopt the Plaintiffs' characterizations of those communications.

64.     In answering Paragraph 153 of the Complaint, the Defendants admit that Thorpe emailed Cross a summary of purported facts concerning his employment dispute with GlaxoSmithKline LLC and the negotiation of the severance agreement on December 3, 2002 and that a retaliatory discharge claim under §3730(h) of the FCA was not included in the Original Complaint but otherwise deny the allegations contained therein.

65.     In answering Paragraph 155 of the Complaint, the Defendants state that the cited cases speak for themselves, decline to adopt the Plaintiffs' characterizations of those cases and otherwise deny the allegations contained therein.

66.     In answering Paragraph 156 of the Complaint, the Defendants state that the cited case speaks for itself, decline to adopt the Plaintiffs' characterization of the cited case and deny the remaining allegations contained therein.

67.     In answering Paragraph 161 of the Complaint, the Defendants admit that Thorpe and Cross exchanged emails on December 10, 2003 prior to Thorpe and Hamrick's execution of a sharing agreement with relators represented by Phillips & Cohen which contained the cited quotations and that Cross filed an amended complaint on behalf of Thorpe and Hamrick in April 2005 but otherwise deny the allegations contained therein.

68.     In answering Paragraphs 166 and 167 of the Complaint, the Defendants state that they are without knowledge or information sufficient to form a belief as to whether Thorpe and Hamrick sought to involve another *qui tam* lawyer as co-counsel in 2009 and deny the remaining allegations contained therein.

69.     In answering Paragraph 171 of the Complaint, the Defendants admit that, in 2008, Cross stated emphatically that he had not received any financial remuneration from Phillips & Cohen.

70.     In answering Paragraph 175 of the Complaint, the Defendants admit the first sentence and that the Plaintiffs have claimed that they discharged him with cause and deny the remaining allegations contained therein.

71.     In answering Paragraph 178 of the Complaint, the Defendants admit that Cross attached a copy of his 40% contingent fee agreement to the Notice of Attorney's Lien, state that the cited case speaks for itself and decline to adopt the Plaintiffs' characterization of the cited case.

72.     In answering Paragraph 182 of the Complaint, the Defendants state that it contains a purported legal argument to which no response is required at this time but that, to the

extent a response is required, the Defendants deny to adopt the Plaintiffs' characterization of the stated purported legal proposition.

73.     In answering Paragraph 191 of the Complaint, the Defendants are without knowledge or information as to whether Thorpe agreed to share 50% of his recovery in the FCA Case with Hamrick and deny the remaining allegations contained therein.

74.     In answering Paragraph 196 of the Complaint, the Defendants admit that the Original Complaint did not include federal anti-kickback or state false claims act claims and was not filed in the District of Massachusetts but deny the remaining allegations contained therein.

75.     In answering Paragraph 201 of the Complaint, the Defendants admit that Thorpe and Hamrick gave up 50% of the relator's share to relators represented by Phillips & Cohen but deny the remaining allegations contained therein.

76.     In answering Paragraphs 185, 195, 205 and 208 of the Complaint, the Defendants re-allege and reincorporate by reference their answers in the paragraphs preceding these paragraphs.

## SECOND DEFENSE

The Plaintiffs have failed to state a claim upon which relief can be granted.

## THIRD DEFENSE

To the extent that the Defendants had obligations to the Plaintiffs, such obligations have been fully, completely and properly performed in every respect.

## FOURTH DEFENSE

If the Plaintiffs suffered any injury or damages, which Defendants deny, then such injuries were caused in whole or in part by the Plaintiffs' own negligence and recovery, if any, should be barred or proportionately reduced.

## FIFTH DEFENSE

The Plaintiffs' claims are barred by the statute of limitations and the Plaintiffs' own laches.

## SIXTH DEFENSE

The Plaintiffs are estopped by their own conduct from asserting any claims against the Defendants and have thus waived their right to present any such claims.

## SEVENTH DEFENSE

If the Plaintiffs were damaged as alleged in the Complaint, any such damage was a result of acts or omissions of persons or entities over whom the Defendants had no control and for whose conduct the Defendants were not legally responsible.

## EIGHTH DEFENSE

The Plaintiffs have failed to mitigate their alleged damages and to that extent are barred from recovery against the Defendants.

## NINTH DEFENSE

The Plaintiffs have not suffered any actual damages and nominal damages, if suffered at all, cannot form the basis of the Plaintiffs' Complaint.

## TENTH DEFENSE

The Defendants acted in good faith and exercised appropriate judgment with respect to their interpretations, decisions and other actions and are therefore entitled to immunity from the claims asserted in this action.

WHEREFORE, the Defendants, Keith F. Cross, Joseph F. Bennett and Cross & Bennett L.L.C., demand judgment in their favor on all counts of the Complaint together with costs, attorney's fees and such other and further relief as this Court deems fair and appropriate.

## CROSS & BENNETT, L.L.C.'S COUNTERCLAIM
## AGAINST GREGORY W. THORPE AND BLAIR HAMRICK

### INTRODUCTION

1.     On July 2, 2012, the Department of Justice ("DOJ") announced that GlaxoSmithKline ("GSK") had agreed to plead guilty and pay *$3 billion* to resolve this consolidated civil matter and related criminal liability arising from GSK's unlawful promotion of certain prescription drugs, its failure to report certain safety data, and false price reporting practices.

2.     Relators Gregory W. Thorpe ("Thorpe") and Blair Hamrick ("Hamrick") were represented by Cross & Bennett, L.L.C. ("Cross & Bennett") in connection with this matter from November 2002 into November 2009.  Cross & Bennett agreed to represent Thorpe and Hamrick almost 10 years ago, when liability arising from the off-label promotion of drugs was unsettled and any recovery was far from certain.  As Thorpe and Hamrick's present *qui tam* counsel, Kenney & McCafferty, P.C. ("Kenney & McCafferty"), recognized in a July 2, 2012 press release, this was "among the very first *qui tam* suits filed against a pharmaceutical company involving allegations of off-label promotion."

3.     Cross & Bennett filed the relevant *qui tam* complaint in Colorado in January 2003.  It was this filing that first alerted the government to fraud by GSK.   For seven years, Cross & Bennett worked tirelessly on behalf of Thorpe and Hamrick with the United States, the various states, and counsel for other relators to build the case against GSK.

4.       Late in 2009, by which time a large settlement appeared probable, Thorpe and Hamrick began efforts to bully Cross & Bennett into reducing its contingency fee.   By this time, Cross & Bennett had completed the vast majority of the work necessary to support the *qui tam* complaints that ultimately resulted in the historic recovery referenced above.   In fact, DOJ had already begun settlement negotiations with GSK.   When Cross & Bennett refused to renegotiate its fee agreement, Thorpe and Hamrick began to complain about the quality of Cross & Bennett's legal work.

5.       Contrary to doing substandard legal work, Cross & Bennett, through years of dedicated representation, was instrumental in achieving the extraordinary results which will now leave Thorpe and Hamrick very wealthy men.   Indeed, GSK's settlement is *the largest combined federal and state health care fraud recovery in a single settlement in the history of the United States and Thorpe and Hamrick will receive relator payments totaling almost 75 million dollars.* This substantial settlement resulted from Cross & Bennett's working as a team with the government attorneys assigned to this case, particularly A.U.S.A. Sara Bloom from Boston, A.U.S.A. Edwin Winstead from Colorado, and Andy Mao and Patrick Jasperse from DOJ in Washington, D.C., as well as attorney Erika Kelton and her associate attorneys, Sam Brown and Erin Krimbill, who represented relators Burke and Gerahty.

6.       Thorpe and Hamrick's present *qui tam* law firm, Kenney & McCafferty, began its representation in January of 2010 by which time DOJ and GSK were negotiating a settlement and the case was in its final stages.   This was less than a year before the announcement of intervention by the United States and long after the bulk of the work that resulted in the recovery had already been done by Cross & Bennett.   On information and belief, Kenney & McCafferty agreed with Thorpe and Hamrick to a 10% contingent fee.

7.      Thorpe and Hamrick have taken the position before this Court that Cross & Bennett is not entitled to *any* legal fees and are thereby seeking to reduce their total attorney's fees from a contractually-set and industry-accepted 40% to only 10%. Quite simply, Thorpe and Hamrick ask this Court to bless their unjust enrichment at the expense of the attorneys who made their recovery possible.

8.      This effort to deprive Cross & Bennett of a well-earned fee implicates important public policy issues concerning the leverage afforded successful *qui tam* relators, the stability and enforceability of contingent fee arrangements and the importance of compensating counsel who risk taking on representations on a contingent fee basis where recovery is uncertain, but significant public health, safety, and fiscal interests are at stake.

9.      Cross & Bennett hereby seeks to protect, enforce, and reduce to judgment its Colorado attorney's lien on Thorpe and Hamrick's share of the settlement, and further, asks this Court to determine the measure of legal fees and disbursements due and owing to Cross & Bennett for its remarkably successful, seven year representation of Thorpe and Hamrick. The Court should not permit Thorpe and Hamrick to be unjustly enriched at the expense of Cross & Bennett by allowing them to keep fees earned by Cross & Bennett and thereby limiting their fees in a high risk contingent fee case to only 10%.

## PARTIES

12.      Cross & Bennett is a law firm organized as a Colorado limited liability company with a usual place of business in Colorado Springs, Colorado.

13.      Cross & Bennett employs Keith F. Cross, Esq. ("Cross") and Joseph F. Bennett, Esq. ("Bennett").

14.     Cross has been a trial lawyer for over 30 years.  He has focused his practice on all aspects of employment law and over the past decade has expanded his concentration to include the False Claims Act, health care fraud, defense contractor fraud, and pharmaceutical fraud.  He is licensed to practice in all courts of the state of Colorado, the federal district court for the District of Colorado, the Tenth Circuit Court of Appeals, the Fifth Circuit Court of Appeals and the United States Supreme Court.  Cross has also handled, with associate counsel, cases in California, Louisiana, and Texas.   He formerly served as a Judicial District Attorney and Public Prosecutor.  Cross received a J.D. from the University of Colorado School of Law in 1978, an M.A. from Ohio State University in 1974, and a B.A. (*Magna Cum Laude*) from the University of Massachusetts in 1972.

15.     Bennett has practiced law for 26 years, beginning his legal career as a public prosecutor in Colorado's Ninth and Fifth Judicial Districts.  Since moving to Colorado Springs in 1990, Bennett has been primarily involved in civil and personal injury litigation.  He presently represents patients and their families in medical malpractice cases, major personal injury lawsuits, and wrongful death cases. Bennett received a J.D. from the University of Colorado School of Law in 1986 and a B.A. (*Magna Cum Laude*) from the University of Massachusetts in 1983.

16.     Thorpe is an individual who, on information and belief, resides at 258 Arrowleaf Lane, Mountain Home, AR  72652.

17.     Hamrick is an individual who, on information and belief, resides at 4509 Watrous Avenue, Tampa, FL  33629.

## JURISDICTION

18.     Jurisdiction in this Court is invoked based on 28 U.S.C. § 1367, 28 USC § 1332, and under Rule 24 of the Federal Rules of Civil Procedure.

## FACTS[1]

19.     On October 3, 2001, Thorpe first met with Cross to discuss issues related to Thorpe's employment at GSK, including purported violations by GSK of the Age Discrimination and Employment Act of 1967.

20.     Between October 2001 and August 2002, Cross & Bennett, through Cross, advised Thorpe on employment issues, including certain disciplinary actions that GSK had taken against him.  Among other things, Cross sent a letter to GSK concerning Thorpe's employment issues, which raised violations of off-label marketing regulations.  Significantly, that letter was later used by the United States as an exhibit to its Complaint in Intervention, filed on October 26, 2011.

21.     In Spring of 2002, Thorpe and Cross first discussed a *qui tam* action under the False Claims Act against GSK.  After initially contacting Cross concerning the potential False Claims Act case, Thorpe was told by Cross that he may not have sufficient time to handle this case.  Then unbeknownst to Cross, Thorpe submitted some of the details of his case to Phillips & Cohen, a prominent, national whistleblower firm located in Washington, D.C. in the hope that the firm would represent him.  Phillips & Cohen declined to represent Thorpe.  Thereafter, Cross agreed to represent Thorpe in the False Claims Act case.

---

[1] The following recitation highlights significant work performed by Cross & Bennett attorneys on behalf of Thorpe and Hamrick and important events over the course of the engagement.  It is not intended, nor should it be construed to be, an exhaustive list of all work by Cross & Bennett.

22.     Throughout the summer and fall of 2002, Cross researched medically accepted indications and payment for covered drugs, among other relevant topics.  At that time, there was little authority or precedent regarding *qui tam* actions arising from off-label marketing, so Cross was largely breaking new ground as he formulated, researched and prepared this suit.

23.     In August 2002, Thorpe first indicated that he might want to bring his friend, Hamrick, on as a co-relator.  At that time, Hamrick was still working for GSK, while Thorpe had signed an enhanced separation agreement in August of 2002, resigning from GSK in exchange for "an unusually favorable severance package . . . ." (*See* paragraph 139 of Government's Complaint in Intervention in this case).

24.     In November 2002, Cross met with Hamrick for the first time and on November 27, 2002, Cross & Bennett, Thorpe, and Hamrick executed a Contingent Fee Agreement to represent Thorpe and Hamrick in the False Claims Act case against GSK.  Since Thorpe had released GSK on his personal claims in his enhanced separation agreement, there was no agreement to represent Thorpe on his potential personal retaliation claims.

25.     Throughout December 2002, Cross conducted factual and legal research on issues relevant to the prospective *qui tam* action, including: law and regulatory authority relating to the off-label marketing of prescription drugs; the relationship of the drug compendia to off-label marketing; the approved uses for Imitrex, Lamictal, Wellbutrin, Lotronex, Flovent, and Advair; the use of Wellbutrin for treatment of pediatric ADHD; the use of Lamictal in the treatment of bipolar disorder; the use of Imitrex for pediatric Migraine; the use of "Medical Scientists" to market off-label; and the use of Advair for the treatment of COPD.

26.     During that time, Cross quickly and efficiently reviewed the documents being provided by Thorpe and Hamrick and drafted a *qui tam* complaint alleging that GSK had

violated the federal False Claims Act by illegally marketing its prescription drugs to the

Medicaid and Tricare programs.

27.     On January 3, 2003, Cross filed the *qui tam* complaint under seal against GSK in

U.S. District Court for the District of Colorado, 1:03-cv-00008-WYD-BNBC.  Due to Cross'

diligence, Thorpe and Hamrick were the first relators to file such an action, a critically important

status under federal law.

28.     Cross reviewed documents from Thorpe and Hamrick throughout 2003 and

conducted his own research concerning, *inter alia*: Imitrex, Wellbutrin, Advair, Lotronex, and

Lamictal; marketing and sales training on various drugs; top prescription writers for different

prescriptions and symptoms; the wining and dining of physicians; methods of targeting high

prescribers; GSK's minority marketing; Canadian drug sales; drug sampling; Medline; FDA

approval of drugs; and medication used to treat bipolar disorders. During this time, Cross was in

almost daily contact with Thorpe and Hamrick and in frequent contact with Edwin Winstead,

Esq. ("Winstead") of the United States Attorney's Office ("USAO") in Denver.  Cross met with

Winstead and delivered boxes of relevant documents to him.  Cross also transmitted documents

and supplemental memoranda to Andrew Mao, Esq. ("Mao") and other attorneys at the DOJ in

Washington, D.C.

29.     In early 2003, Cross prepared himself and Thorpe and Hamrick for a significant

meeting with representatives from the DOJ, the USAO, the Federal Bureau of Investigation

("FBI"), the Office of the Inspector General for the U.S. Department of Health of Human

Services, and the Colorado Medicare Fraud Control Unit.  The meeting took place on March 3,

2003 in Denver, lasted several hours, and included interviews of both Thorpe and Hamrick.  The

various government representatives present seemed very interested in the allegations made in the

*qui tam* complaint and appeared to be relying upon the information provided by Thorpe and Hamrick and the legal analysis of Cross & Bennett.

30.     After this meeting, through April and May of 2003, Cross continued to confer with Thorpe and Hamrick and to gather and review documents. During that time, Cross focused on: Lamictal for Bipolar off-label; off-label presentations about the use of Advair for COPD; the FDA Adverse Event Reporting Program; HHS Guidance on Financial Interests in Research; the use of Wellbutrin for weight loss; and Paxil, Valtrex, and Advair formulary information and promotion.

31.     On July 18, 2003, Michael Theis, Esq. ("Theis"), U.S. Attorney for the District of Colorado, and Winstead called Cross to inform him of a related case that had been later filed in the District of Massachusetts by Erika Kelton, Esq. ("Kelton") of Phillips & Cohen. That case was brought by GSK employees who were much higher-level than Thorpe and Hamrick, with a significantly larger database of documents and potentially better inside knowledge of GSK's management. As a result of their broader access to information and documents, their complaint contained allegations that expanded the geographic scope and substance of GSK's misconduct, in effect expanding a regional case to a national case. Theis and Winstead encouraged Cross to work out an agreement with Phillips & Cohen whereby Thorpe, Hamrick, and the Phillips & Cohen relators would pool their knowledge and resources to advance both the Colorado and Massachusetts *qui tam* matters.

32.     In the fall of 2003, Cross provided the government with a list of prominent GSK paid speakers who were likely to be making off-label presentations to physicians.

33.     Between August 2003 and January 2004, Cross, in close concert with Thorpe and Hamrick, negotiated an agreement with Phillips & Cohen. Thorpe initially wanted to agree to a

2/3 to 1/3 split, but ultimately decided that he would agree to a 50-50 split as long as Phillips and Cohen had two, not just one, higher level GSK employees as relators. Hamrick also agreed. The agreement, executed by Thorpe, Hamrick and the Phillips & Cohen relators, pledged, *inter alia*, that they would work together to litigate their respective cases and to share "all monies that are awarded as relator share awards in each of the Colorado and Massachusetts *qui tam* actions, no matter what allegations form the basis for the Governments' recovery(ies) and ultimate award(s)." Thorpe and Hamrick were kept informed of the settlement negotiations throughout and consented to the agreement with full disclosure of the potential risks and benefits.

34.      During the second half of 2003, Cross was in regular communication with government agents, including officials at the U.S. Food and Drug Administration ("FDA"), who were working on the ongoing investigation of GSK. Cross provided the government with research and documents concerning: pediatric migraines and Imitrex; Paxil; top off-label speakers; and numerous other subjects related to the off-label promotion of drugs documented in Thorpe and Hamrick's initial *qui tam* complaint.

35.      In January 2004, the Colorado USAO issued its first subpoena to GSK, based largely on information provided by Thorpe and Hamrick and the Phillips & Cohen relators. GSK began producing documents pursuant to the subpoena on a "rolling" basis. According to Winstead, the initial production totaled between one and two million documents. GSK produced more documents pursuant to the subpoena each year thereafter. As of 2009, the federal government had accumulated between 15 and 17 million documents from GSK.

36.      On February 4, 2004, the government notified Cross of a complaint filed in 2000 prior to Thorpe and Hamrick's complaint. Cross, in close concert with Thorpe, Hamrick, and Kelton engaged in protracted negotiations with that plaintiff's counsel concerning his entitlement

to any percentage of the relator's share.  Ultimately, the parties reached agreement in July 2004

to share a percentage of any recovery with that plaintiff, who then dismissed his case with

prejudice.

37.    Cross continued throughout 2004 to receive and evaluate information forwarded

by Hamrick on various drug issues, including: company initiatives related to fraudulent activity,

such as the destruction and replacement of notebook computers for all GSK marketing

representatives and GSK's new "Write-Right" program; new speaker programs; GSK's FaxBack

documents; and literature and studies it was providing to physicians through its marketing

representatives.

38.    Also throughout 2004, Cross was in almost daily contact with his clients and in

frequent contact with the federal and state governments.  Additionally, Cross was sharing

information back and forth with Kelton, pursuant to the agreement between their clients.

39.    From January through April 2005, Cross devoted much of his time to preparing

the First Amended Complaint, which was filed on April 27, 2005.  The First Amended

Complaint included retaliation and termination claims on behalf of Thorpe and Hamrick.

Although the value of these claims was not clear, Cross felt that the retaliatory conduct by GSK

against its former employees would help spur the government to action.  At the time, Thorpe told

Cross that he was very happy with the First Amended Complaint.

40.    From May 2005 through December 2005, Cross continued to confer with

Winstead and Kelton concerning the case.  During 2006, at the request of Thorpe and Hamrick

(who were increasingly distressed by the pace of the government's investigation), Cross spoke

with Kelton and Winstead about advancing the case.  Cross then reached out to state Medicaid

Fraud Control Units in Texas and Virginia in an effort to convince them to independently pursue

state claims. Cross also explored the possibility of electronically mining the millions of documents produced by GSK in an effort to assist the government in its investigation and prosecution of the False Claims Act case.

41.   Cross & Bennett and Thorpe and Hamrick executed a Contingent Fee Agreement dated February 1, 2007, which superseded the Contingent Fee Agreement executed on November 27, 2002. The February 1, 2007 Agreement provided that Cross & Bennett's fees would be 40% of the gross amount collected. (*See* **Exhibit 1** hereto[2]). Further, Cross & Bennett agreed to advance money for costs related to the matter, which, in the event of settlement or judgment, would be reimbursed in full.

42.   The February 1, 2007 Agreement also provided that, in the event that Thorpe and Hamrick terminated the agreement,

> without wrongful conduct by the attorneys which would cause the attorneys to forfeit any fee, or if the attorneys justifiably withdraw from the representation of the clients, the attorneys may ask the court or other tribunal to order the clients to pay the attorneys a fee based upon the reasonable value of the services provided by the attorneys. If the attorneys and the clients cannot agree how the attorneys are to be compensated in this circumstance, the attorneys will request the court or other tribunal to determine: (1) if the clients have been unfairly or unjustly enriched if the clients do not pay a fee to the attorneys; and (2) the amount of the fee owed, taking into account the nature and complexity of the clients' case, the time and skill devoted to the clients' case by the attorneys, and the benefit obtained by the clients as a result of the attorneys' efforts. Any such fee shall be payable only out of the gross amount collected by or on behalf of the clients and the amount of such fee shall not be greater than the fee that would have been earned by the attorneys if the contingency described in this contingent fee agreement had occurred.

43.   Throughout 2007, Cross continued to send additional information to the federal government and, in particular, documents and data directly to Sara Bloom, Esq. ("Bloom") of the

---

[2] Filed with this Counterclaim are Exhibits 1, 5, and 9-10 thereto. Given the nature of Exhibits 2-4, 6-8, and 11 to the Counterclaim, Cross & Bennett will seek leave to file them under seal.

Boston USAO and Mao of DOJ. Cross researched and forwarded information concerning "Operation Hustle," including tapes and documents; and Imitrex, Wellbutrin, and Advair. Cross also responded to inquiries by Winstead with regard to the off-label use of Lamictal.

44.     In January 2008, Cross traveled with Thorpe and Hamrick to Boston for meetings with Bloom and FBI agents. Over the course of the trip, Thorpe and Hamrick engaged in a series of interviews and made sworn statements. Thereafter, Cross responded to additional requests for information from Bloom, the FBI, and Mao on subjects including Valtrex, Imitrex, and Seratonin syndrome.

45.     Cross also drafted a Second Amended Complaint to correct minor errors in the first and to add states that had recently adopted *qui tam* statutes. Cross filed the Second Amended Complaint on July 11, 2008. During July 2008, Cross fielded requests for information from Patrick Jasperse, Esq. ("Jasperse") of the DOJ Office of Consumer Litigation, concerning the role of GSK's attorneys and compliance officers in off-label marketing.

46.     During this same time, Cross worked with Kelton to convince the DOJ to permit Cross and Kelton to data mine documents that GSK had produced in response to the government subpoena in order to help build the case against GSK on behalf of their clients.

47.     To facilitate the data mining, Cross purchased a notebook computer and data mining software and had it delivered to the office of the United States Attorney in Boston. Cross then performed data mining in Boston during the second and last weeks of October 2008.

48.     Through the rest of 2008, Cross continued to research and review medical literature relating to: Advair; spirometry; asthma and COPD; and the clinical trials that GSK used to obtain approval for Advair. He also purchased texts relating to statistics and clinical trials; familiarized himself with clinical trial terminology; and researched trials for an ICS/LABA

combination drug that were eventually terminated by GSK. In November 2008, Cross researched off-label issues relating to Lamictal for Winstead and sent him information that he had requested concerning certain former GSK employees.

49.     After conducting extensive research and data mining with Kelton and her associates, in November, 2008, Cross prepared a detailed analysis for the government of the off-label promotion of Advair for disease states not indicated on the FDA label, particularly mild intermittent asthma. His analysis linked his research of marketing ploys used by GSK in promoting Advair to off-label pediatric marketing, manipulation of clinical trials, and use of misleading journal literature in GSK marketing based on GSK marketing training manuals obtained from Hamrick. This research helped form the foundation for the most significant part of the government's case against GSK: the off-label promotion of Advair for first-line treatment of mild, intermittent asthma.

50.     In December 2008, Cross provided additional Lamictal research to Winstead and traveled to Boston to meet with Bloom and Kelton and continue data mining.

51.     Towards the end of December 2008, Cross drafted a Third Amended Complaint, adding allegations concerning, *inter alia*, Paxil, Advair, and steroid sparing in asthma treatment. Cross filed the Third Amended Complaint on January 2, 2009.

52.     Cross continued to send additional research to the government throughout the month of January and, from January 27-31, 2009, conducted additional data mining in Boston with Kelton and Bloom.

53.     Between February 2009 and April 2009, Cross researched whether GSK had misrepresented certain study results on the efficacy of Advair for COPD and side effects.

54. Cross obtained a partial lifting of the court's seal and sent certified letters to the states named in the amended complaints in March 2009. During the course of the representation of Thorpe and Hamrick, Cross was in regular contact with state Medicaid Fraud Control Unit attorneys and paralegals from various states, including Virginia, Texas, Florida, and New Hampshire. Cross was informed that the states had formed a joint task force, at that time led by the Ohio Medicaid Fraud Control Unit, and that none of the states intended to try to prosecute any of the claims against GSK separately.

55. From May 16 to 20, 2009, Cross again traveled to Boston, conducted data mining, and met with Kelton and Bloom.

56. Cross traveled to Boston from June 13 to 18, 2009 for data mining and to meet with Kelton, Bloom and DOJ investigators. These meetings focused on educating Bloom and DOJ about the significant dangers of off-label Advair marketing.

57. On August 21, 2009, Cross sent a detailed analysis to the DOJ of GSK's misuse of medical literature in its off-label marketing of Advair, along with an analysis of the National Asthma Education and Prevention Program classification of asthma severity to demonstrate how GSK marketed Advair off-label nationwide. Cross and Bennett traveled to Boston from August 26 to 30, 2009 for data mining and to again meet with Bloom and Winstead. During that time, Kelton, with the assistance of Cross, gave a presentation on Advair for mild asthma. The presentation juxtaposed evidence that GSK officials had assured the FDA that Advair would *never* be used for mild, intermittent asthma or as a first-line treatment for asthma, with documents evidencing GSK's program to market Advair nationwide for exactly these uses.

58. In September 2009, Cross continued to research and share information on Advair with Kelton and her associates in anticipation of a meeting in Washington with DOJ. The

meeting was being held for the purpose of the relators presenting to DOJ a well-supported argument that the Advair case alone was worth as much as $1.5 billion.

59.    On September 9, 2009, Thorpe sent an email to Cross telling him that he had identified a new potential "associate" attorney who was willing to step in to "help us finalize all of the important issues and get the settlement WE deserve…and nobody else." According to the email, the new attorney was also willing to renegotiate the agreement with the Phillips & Cohen relators to a more "reasonable 25-30%." (*See* **Exhibit 2** hereto).

60.    From September 17 to 19, 2009, Cross attended the meeting in Washington, D.C. with all of the government representatives interested in the case. Cross and Kelton presented their arguments that the Advair off-label case alone was worth $1.5 billion. (This was in addition to the amount of approximately $400 million that Bloom had already indicated, in a previous meeting with Cross, would be due from GSK's illegal marketing practices involving other GSK drugs.)

61.    On September 22, 2009, Thorpe sent an e-mail to Cross again discussing proposed new associate counsel, saying "[w]e have a proposed sharing agreement, which we think is fair and equitable." He also admits that new counsel "respects how far the case has gotten." (*See* **Exhibit 3** hereto).

62.    On September 22, 2009, Cross sent Thorpe and Hamrick a letter declining to amend the fee agreement in the manner proposed. (*See* **Exhibit 4** hereto). Cross also told Thorpe and Hamrick that, although he did not see any need for associate counsel on the case, if they wanted to retain associate counsel he would be willing to work with him, provided that this would not affect the fee agreement already in place. Cross refused to accede to his client's

transparent efforts to reduce their liability for legal fees by alleging specious claims of ethical

violations and malpractice.

63.     The next day, Thorpe forwarded the proposed agreement which provided, *inter alia*, that Cross & Bennett would receive, at most, 24% of any award to relators and the "associate counsel" would receive 8%. This would have had the effect of reducing Thorpe and Hamrick's overall contingency payout to 32%. The new proposed agreement further provided that Thorpe would receive 39% of any award while Hamrick would receive only 29%. Thorpe and Hamrick also threatened to bring malpractice claims against Cross & Bennett, but offered to "void" such claims if Cross & Bennett agreed to all terms of the proposal, including substantially discounting their fees. (*See* **Exhibit 5** hereto). Thorpe and Hamrick had not raised the issue of decreasing their attorneys' fees prior to a significant recovery looking reasonably certain.

64.     Cross prepared the Fourth Amended Complaint, which he filed on October 2, 2009 and which set forth new, detailed allegations concerning Advair.

65.     On October 9, 2009, Thorpe sent Cross an email stating "[a]s you said to us...How much money do you need. Well, we want every penny we deserve at this stage....In the end, you may get nothing and I am not sure you deserve anything after talking to other counsel and how this matter was handled since I walked into your office. On the other hand you may get something, but I will have the money to fight you as long as you want or Counsel willing to do it." (*See* **Exhibit 6** hereto).

66.     On October 21, 2009, Thorpe sent a termination letter to Cross by facsimile.

67.     On October 22, 2009, Thorpe sent Cross another email in which he said, "You need to think about your situation, as if any more happens that I deem detrimental to our case..one thing-you will have done it to yourself. You hold your own future as to how you

behave, post termination. My legal options are endless, and could be highly detrimental to your future in the legal profession. (not just my opinion)…..Please do not let your emotions ruin your career, you have more money than you need right now...as you always told us "how much do you need?" (*See* **Exhibit 7** hereto).

68.     On October 30, 2009, Thorpe sent an email to Cross in which he stated "Please be aware of what I said, that if you did one more thing that was not only unbalanced as to your mental state, as well as VIOLATING my attorney client privilege, you would trigger a malpractice suit and we would attempt to deny you anything in the matter, up to and including any attorney fees and costs. You blew your mediation chance, in other words, and furthered the malpractice issues….Get over it, you are finished and you did it to yourself." (*See* **Exhibit 8** hereto). The October 2009 emails described herein, were transparent attempts by Thorpe to coerce Cross & Bennett into waiving its claim for fees.

69.     On November 11, 2009, Thorpe and Hamrick, as promised, did, in fact, file a formal grievance with the Colorado Supreme Court's Office of Regulatory Counsel, which investigates and prosecutes attorney discipline matters in that state, alleging that Cross had committed malpractice and various ethical violations.

70.     On November 23, 2009, the Office of Disciplinary Counsel informed Thorpe and Hamrick that it had reviewed the allegations of misconduct and "determined that the information you provided *does not set forth facts, which if proven, would constitute grounds for the imposition of discipline* by the offices of the Supreme Court of Colorado. Therefore we are closing this matter and will take no further action on your request." (*See* **Exhibit 9** hereto).

71.     On November 12, 2009, Cross & Bennett filed a Notice of Attorney's Lien in the Colorado action.  (*See* **Exhibit 10** hereto).  The Attorney's Lien claimed a lien upon a portion of

all monies, properties, choses in action, claims and demands in suit, upon any property which may be awarded to the Thorpe and Hamrick in this matter and upon any and all Relator shares, regardless of the source of those shares, and upon any money due to Thorpe and Hamrick in the hands of GSK, the United States of America, the Department of Justice, and the states of California, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Nevada, New Hampshire, New Jersey, New Mexico, New York, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Minnesota, North Carolina and Wisconsin, and the District of Columbia, and any other state that is a participant in the settlement or judgment in the instant case, or in the currently sealed case of *United States ex rel. Gerahty* in the United States District Court for the District of Massachusetts, or in any other sealed or unsealed *case* against Defendants arising from or related to the same causes of action.

72.     In November 2009, Thorpe and Hamrick retained Marcella Auerbach, Esq., Kenneth Nolan, Esq., and William Martinez, Esq.  In January 2010, Auerbach and Nolan withdrew from representation of Thorpe and Hamrick and were replaced by the law firm of Kenney & McCafferty.

73.     From November 2009 through April 2010, Cross & Bennett spent hundreds of hours Bates stamping and forwarding their litigation file, including documents, exhibits, and emails to Thorpe and Hamrick's new counsel.

74.     On information and belief, Kenney & McCafferty agreed to a 10% share of Thorpe and Hamrick's recovery, and thus will receive approximately $7.439 million for work done in the comparatively short period of time it represented Thorpe and Hamrick.

75.     The United States filed a Notice of Intervention on January 14, 2011.

76.     On March 7, 2011, the Colorado case (1:03-cv-00008-WYD-BNBC) was transferred to the United States District Court for the District of Massachusetts and assigned case number 1:11-cv-10398-RWZ.  On April 5, 2011, the Court consolidated 1:11-cv-10398-RWZ into case 1:03-cv-10641-RWZ.

77.     The United States filed its Complaint in Intervention on October 26, 2011.

78.     On November 3, 2011, GSK announced an agreement in principle to pay the United States $3 billion in a global settlement of all illegal marketing claims.

79.     Again, on July 2, 2012, the Department of Justice announced that GSK had agreed to plead guilty and pay $3 billion to resolve its criminal and civil liability arising from, *inter alia*, the company's unlawful promotion of certain prescription drugs.

80.     Of the $1.017 billion civil settlement, the overwhelming majority -- $686,049,841 -- was attributed to the off-label marketing of Advair.  Recovery for that conduct was due, in significant part, to the hard work of Cross, working as a team with Bloom, Winstead, Mao, Jasperse, Kelton, and her associates.  This was a theory of liability identified, researched, and largely substantiated by the legal team and its work mining all of the available data.  Thorpe and Hamrick would not have realized such an extraordinary recovery without Cross' efforts.  Thorpe provided almost no information relevant to off-label marketing of Advair for mild intermittent asthma, and Hamrick did provide valuable information in support of the theory, but only after being asked to do so by Cross as the theory was being developed.

81.     At all times, Cross & Bennett acted carefully and prudently to protect the interests of both Thorpe and Hamrick.  This is evidenced by Cross & Bennett's retention of special ethics counsel to assist them in dealing with Thorpe and Hamrick, who became progressively more difficult as time went on.  Cross also advised Thorpe and Hamrick to retain separate counsel to

resolve a dispute that they were having between themselves as a result of Thorpe wanting to increase his percentage share of any recovery at the expense of Hamrick. Further, in October 2009, Cross told them to retain independent counsel if they wanted to allege misconduct by Cross & Bennett. (*See* **Exhibit 11** hereto).

82.     Even after the termination of Cross & Bennett, Cross continued to assist new counsel, Kenney & McCafferty, when requested. At the same time this assistance was being supplied, Thorpe and Hamrick's other counsel, William Leonard, Esq. was threatening malpractice claims and telling counsel for Cross & Bennett that their Attorney's Lien was worthless.

83.     On information and belief, federal and state share payments to Thorpe and Hamrick are imminent. The federal share payment due to Thorpe and Hamrick (excluding monies owed to the Phillips & Cohen relators) is approximately $63,562,195 and the state share is approximately $10,834,696. Cross & Bennett asserts a lien upon 40% of the federal share, the state share, and any other recovery by Thorpe and Hamrick in this action.

84.     Cross & Bennett calculates that its attorneys worked thousands of hours on behalf of Thorpe and Hamrick and that it incurred over $34,064.43 in unreimbursed expenses.

85.     Further reflecting the volume of work performed by Cross & Bennett on behalf of Thorpe and Hamrick and the intensity of the attorney-client relationship are Cross & Bennett's litigation files, which included more than 42,000 Bates-numbered pages and 4,750 email messages to and from these clients during the period that Cross & Bennett represented them.

## COUNT I – QUANTUM MERUIT (UNJUST ENRICHMENT)

86.     Cross & Bennett repeats and incorporates by reference the allegations contained in paragraphs 1 through 85 above.

87.    By providing legal services to Thorpe and Hamrick from November 2002 through November 2009, Cross & Bennett conferred a benefit upon Thorpe and Hamrick which was appreciated and accepted by Thorpe and Hamrick under such circumstances that it would be inequitable for the benefit to be retained without payment of its value.

## REQUESTED RELIEF

WHEREFORE, Cross & Bennett requests that the Court:

A. Order that, pursuant to the Attorney's Lien, 40% of Thorpe and Hamrick's federal and state recoveries, and any other monies subsequently recovered by Thorpe and Hamrick in this action, be deposited into the Registry of the Court and not released until further order of this Court;

B. Order that this matter be handled on an expedited basis given that Cross & Bennett has waited  almost 10 years for payment of attorney's fees and reimbursement of expenses;

C. Determine the measure of legal fees and disbursements due and owing to Cross & Bennett, pursuant to the Attorney's Lien, for its representation of Thorpe and Hamrick;

D. Reduce Cross & Bennett's Attorney's Lien to Judgment; and

E. Award Cross & Bennett any additional relief that this Court deems just and proper.


Dated: November 16, 2012

Respectfully submitted,

KEITH F. CROSS,
JOSEPH F. BENNETT and CROSS &
BENNETT L.L.C.,
Defendants

By their attorneys,

/s/ George A. Berman
George A. Berman, Esq. (BBO # 040200)
Alan K. Tannenwald, Esq. (BBO # 672375)
PEABODY & ARNOLD LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210
(617) 951-2100
gberman@peabodyarnold.com
atannenwald@peabodyarnold.com

(Counsel of Record as to Plaintiffs' Claims
Against Defendants)
CROSS & BENNETT L.L.C.,
Plaintiff-in-Counterclaim

By its attorneys,

/s/ Allison D. Burroughs
Allison D. Burroughs (BBO # 609346)
Benjamin L. Mack (BBO # 661590)
NUTTER, McCLENNEN & FISH, LLP
155 Seaport Boulevard
Boston, MA 02110
(617) 439-2775
aburroughs@nutter.com
bmack@nutter.com

(Counsel of Record as to Defendant Cross &
Bennett L.L.C.'s Counterclaim Against
Plaintiffs)

## CERTIFICATE OF SERVICE

I hereby certify that, on November 16, 2012, this document (filed through the ECF system) will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: November 16, 2012                    /s/  Alan K. Tannenwald

776828_1
14818-96630