## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

GREGORY W. THORPE and BLAIR HAMRICK

     Plaintiffs and Defendants in Counterclaim,

v.

KEITH F. CROSS and JOSEPH F. BENNETT,

     Defendants,

and

CROSS & BENNETT, L.L.C.,

     Defendant and Plaintiff in Counterclaim.

---

CROSS & BENNETT, L.L.C.,

     Plaintiff,

v.

GREGORY W. THORPE and BLAIR HAMRICK,

     Defendants.

**C. A. No. 12-11632-RWZ**
**CONSOLIDATED ACTION**

## MEMORANDUM IN SUPPORT OF CROSS & BENNETT'S MOTION TO COMPEL PRODUCTION OF THORPE AND HAMRICK'S COMMUNICATIONS WITH SUCCESSOR COUNSEL AND OTHER ATTORNEYS WHOSE COMMUNICATIONS THEY HAVE SELECTIVELY DISCLOSED

Gregory Thorpe and Blair Hamrick intend to use oral communications and thousands of emails that would normally be protected by the attorney-client privilege to establish that Keith Cross, Joseph Bennett and Cross & Bennett L.L.C. (collectively, "Cross & Bennett") improperly advised them on every major decision in the qui tam litigation and to establish that the services of Cross & Bennett had no value.  Yet Thorpe and Hamrick's communications with successor counsel as well as other attorneys with whom they conferred are just as important to Cross & Bennett's defense.  These conversations will establish that the statute of limitations on the malpractice claims ran years ago; that Cross & Bennett's work was instrumental in obtaining the record setting qui tam settlement; and that any harm Thorpe and Hamrick suffered was either not caused by Cross & Bennett or was not the result of any breach of the standard of care.

Thorpe and Hamrick have waived their rights to protect these documents several times over.  They were waived when they filed their malpractice action, which waives the privilege with regard to all attorney communications with the claimants in the underlying litigation.  *Zabin v. Picciotto*, 73 Mass. App. 141, 896 N.E. 2d 937 (Mass. App. 2008) ("*Zabin*").  They were waived when they argued that the statute of limitations on their claims was tolled because they discovered critical facts when they consulted attorneys in 2009.  They were waived when Thorpe selectively disclosed numerous conversations with attorneys to Keith Cross in late 2009 in an effort to intimidate him.  And they were waived when Thorpe and Hamrick selectively produced favorable communications with successor counsel but elected not to produce the others.

Thus, Cross & Bennett are entitled to discovery of all communications between Thorpe and Hamrick and the law firms of Nolan & Auerbach and Kenney & McCafferty (collectively, "successor counsel"), the two law firms that succeeded to the representation of Thorpe and

Hamrick in the qui tam action.  Additionally, they are entitled to communications between

Thorpe and the numerous attorneys from whom he sought malpractice opinions in 2009.

One federal court has already ruled in Cross & Bennett's favor on some of the privilege

issues raised by this motion.  Cross & Bennett served a subpoena duces tecum on Joel Androphy,

one of the attorneys with whom Thorpe and Hamrick had conferred in 2009.  Androphy, on

instructions from Thorpe and Hamrick, claimed his documents were privileged.  The Southern

District of Texas ordered all documents to be produced, Exhibit 25, finding that Thorpe had

waived any privilege "when he told the [Cross & Bennett] about his conversations with lawyers

at Berg & Androphy and when he sued Cross & Bennett for malpractice."

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Underlying Litigation

In October 2001, Gregory Thorpe retained Keith Cross on an hourly basis to represent

him with regard to potential age discrimination/unlawful retaliation claims against his employer,

GlaxoSmithKline ("GSK").  By April 2002, Cross had gotten GSK to offer Thorpe an enhanced

severance package in exchange for a comprehensive release from Thorpe.  Thorpe, however,

became interested in bringing a qui tam action against GSK for its off-label promotion of

Wellbutrin and other drugs.  After reviewing Thorpe's evidence, in August 2002 Cross told

Thorpe that he was willing to bring a federal False Claims Act case on Thorpe's behalf, but that

he would not represent him on his employment claims on a contingency basis.  On August 9,

2002, Thorpe accepted GSK's severance package and released all claims against it.  Two weeks

later, he executed a contingent fee agreement with Cross & Bennett, Exhibit 1, regarding the

anticipated FCA action.  The agreement expressly disclaimed Cross & Bennett's representation

of Thorpe on any employment claims.

Cross & Bennett was not the only firm Thorpe solicited to file an FCA claim on his

behalf.  Shortly after inquiring whether Cross would be interested in his qui tam claim, he also

approached Phillips & Cohen, a well known Washington, D.C. firm, specializing in FCA claims.

After reviewing the material Thorpe sent it, Phillips & Cohen declined to take his case.

While preparing the case, Cross informed Thorpe that he might not have enough evidence

to support the suit.  Thorpe suggested that a friend, Blair Hamrick, could join the lawsuit.

Hamrick had knowledge of off-label promotion of additional drugs, including Advair, and could

obtain additional evidence for the lawsuit because he was still employed by GSK.  After meeting

Hamrick, Cross told Thorpe that Hamrick's information would greatly assist the case.  Thorpe

agreed to pursue the case with Hamrick as equal partners, and by November 27, 2002, a new fee

agreement with Cross & Bennett was executed.  The Thorpe/Hamrick fee agreement, Exhibit 2,

also limited Cross & Bennett's representation to FCA litigation, specifically excluding claims

"for wrongful termination and retaliation."

On January 3, 2003, Cross & Bennett filed the FCA action against GSK in the District of

Colorado.  The complaint alleged that GSK had promoted Wellbutrin, Advair and Lamictal off

label, and that GSK had paid kickbacks to physicians to encourage prescribing.  Virtually all of

Thorpe and Hamrick's allegations concerned promotion in Colorado and surrounding states.

In July 2003, Thorpe and Hamrick learned that Phillips & Cohen had filed a qui tam

action in this Court against GSK, alleging off-label promotion of many of the same drugs

identified in the Colorado action.  Although Thorpe and Hamrick were the first to file, Phillips &

Cohen's clients were more highly placed in GSK, with comprehensive knowledge of GSK's

nationwide marketing policies.  They had thousands of documents supporting their allegations of

nationwide illegal conduct.  The Phillips & Cohen complaint also contained allegations relating

to the illegal promotion of additional drugs, claims under eleven state qui tam statutes and a separate count for illegal kickbacks.

The U.S. Attorney's Offices encouraged the two sets of relators to work out a deal.  A long negotiation ensued in which all of the advantages and deficiencies of both complaints were discussed at length with Thorpe and Hamrick.  In October 2003, Erika Kelton, the lead attorney for Phillips & Cohen, offered a 50/50 split and Thorpe and Hamrick readily agreed.  A Sharing Agreement, Exhibit 3, was executed on January 27, 2004.

As the case wore on, Thorpe became convinced that he was the only "real whistleblower" and attempted to undermine all agreements he had made regarding division of any relator award.  In 2007, he bullied Hamrick into reducing Hamrick's share of any recovery from 50% to 47%.  At about the same time, Cross & Bennett agreed to reduce their contingent fee percentage from 45% to 40%.  And almost from the day the ink dried on the sharing agreement with the Phillips & Cohen relators, Thorpe urged Cross to repudiate the agreement by threatening Phillips & Cohen with ethics complaints due to its purported misuse of his confidential information after they rejected his case in 2002.  Thorpe also began to claim that Cross & Bennett had failed to preserve his claim against GSK for employment retaliation under 31 U.S.C. § 3730(h), notwithstanding the fact that the fee agreement excluded employment claims and that Thorpe had released his employment claims (for a substantial payment) in 2002.

By August 2009, Cross & Bennett informed their clients that GSK had told the government's lawyers that it wanted a "handshake agreement" by the end of the year, and that the civil settlement would likely exceed $1 billion, the largest ever civil recovery in a qui tam case.  Recognizing that once the case settled he would have to pay Cross & Bennett the full amount of the agreed upon contingency fee, Thorpe searched for some excuse to renegotiate.

Thorpe told Cross & Bennett they needed a second opinion and approached Berg & Androphy, a Houston, Texas firm with qui tam expertise, about entering the case as co-counsel. Thorpe told Joel Androphy that most of the work was done and that the expected settlement might surpass the largest settlement on record.  Exhibit 5.  Thorpe sought co-counsel as an excuse for restructuring the entire fee agreement, intending to reduce the total amount of the attorneys' fees paid from 40% to 32%.  In late September, Cross informed Thorpe that he had no objection to working with Androphy, but that he refused to reduce Cross & Bennett's fee a second time.  Thorpe emailed Cross informing him "you may be out of a job."  Exhibit 7.

Commencing on September 30, 2009, Thorpe sent Cross a series of emails which purported to inform Cross of what a number of "qui tam experts" and "competent counsel" told Thorpe about the quality of Cross's representation.  Uniformly, according to Thorpe, these "experts" believed that Cross & Bennett had engaged in serious professional misconduct.  The purpose of these emails was to intimidate Cross & Bennett into resigning from the case without seeking compensation.  Notwithstanding their disclosure to Cross, Thorpe and Hamrick now take the position that these attorney-client communications are confidential.

On October 21, 2009, Thorpe and Hamrick discharged Cross & Bennett.  Exhibit 11. Nolan & Auerbach, a law firm in Fort Lauderdale, FL, replaced them.  Exhibit 12.  Three months later, in January, 2010, Thorpe and Hamrick discharged Nolan & Auerbach and retained Kenney & McCafferty of Philadelphia, PA to represent them in the qui tam action.  Kenney & McCafferty agreed to conclude the litigation in exchange for 10% of Thorpe and Hamrick's qui tam recovery and 100% of all statutory fees paid by GSK for their time in the case.

In February 2011, Thorpe and Hamrick moved to transfer the Colorado qui tam suit to this District.  In November 2011, GSK announced an agreement in principle with the United

States to resolve the claims covered by the qui tam action, and by early 2012, Thorpe and

Hamrick agreed that the proposed settlement was fair and reasonable and that they would not

pursue any FCA claims the United States declined to settle.  Successor counsel filed two

amended complaints, but did not engage in any contested motion practice prior to the settlement.

The GSK settlement was announced to the public in July 2012.  As Cross & Bennett had

predicted in August 2009, the civil settlement exceeded $1 billion and was the largest civil

settlement ever under the FCA.  Thorpe and Hamrick were awarded approximately $75 million

as their relators' share; Kenney & McCafferty were paid more than $8 million for their work.

True to Thorpe's 2009 threats, Cross & Bennett have not been paid for their years of services.

### B.      The Matters at Issue and the Contested Discovery Requests

The Court has two complaints before it in this consolidated action.  Cross & Bennett seek

compensation for seven years of legal services.  Thorpe and Hamrick, in their answer, deny that

Cross & Bennett's service had any value, contending that the record settlement was based on the

work of "other counsel," including successor counsel.  Exhibit 19, ¶ ¶ 5-6.

In the other complaint, Thorpe and Hamrick claim they relied on negligent advice from

Cross & Bennett for every major decision in this litigation, including Thorpe's release of GSK

and acceptance of a severance package in August 2002; Thorpe's agreement to split any recovery

evenly with Hamrick in October 2002; and Thorpe and Hamrick's agreement to split their

relator's award with Phillips & Cohen's clients in January 2004.  To avoid the application of

Colorado's two year statute of limitations on these claims, Thorpe and Hamrick claim they did

not discover Cross & Bennett's malpractice until Thorpe conferred with several lawyers in 2009.

Additionally, Thorpe and Hamrick claim that Cross & Bennett misrepresented the terms

of a protective order; failed to file a timely § 3730(h) retaliation claim for Thorpe; failed to

adequately pursue claims relating to Paxil; and failed to renegotiate the Phillips & Cohen Sharing

Agreement.  Much, if not all, of the harm caused by these alleged acts of malpractice could have been caused, enhanced, cured or mitigated by Thorpe and Hamrick's successor counsel.

On March 6, 2013, Cross & Bennett requested successor counsel's file and all documents relating to any communications Thorpe or Hamrick had with other attorneys relating to Cross & Bennett's representation of them.  Exhibit 20, Requests 20-24.  Cross & Bennett also served subpoenas on Kenney & McCafferty and Nolan & Auerbach.  Exhibits 23 and 24.  Subject to the attorney-client privilege and the work product doctrine, Thorpe and Hamrick agreed to produce the requested documents as well as successor counsel's files.

Pursuant to this Court's order, Thorpe and Hamrick produced responsive documents in the agreed upon format between July 15 and August 15, 2013.  On August 23, 2013, they produced a 555 page privilege log in 7 point type listing 13,738 documents alleged to be privileged, most of which were communications between Thorpe and/or Hamrick and their lawyers.[1]  Other than drafts of amended complaints, almost nothing produced helps to describe what successor counsel did.  For example, in excess of 11,000 Kenney & McCafferty emails were identified, but only 248 were produced—none of which were written before Thorpe and Hamrick accepted terms of the GSK settlement (other than emails to which Keith Cross or his counsel had been a party).  No pre-settlement correspondence with Phillips & Cohen was produced.  No time records describing what successor counsel did were produced.   No communications with experts or other witnesses were produced.  Most documents produced were copies of material Cross & Bennett delivered to successor counsel in 2009 and 2010.

---

[1] The privilege log is too lengthy to be produced as an exhibit.  To give the Court an idea of its unwieldiness, the first 30 pages are attached as Exhibit 27.  The entire log is available upon request.  A supplemental privilege log, listing another 411 documents, was produced on August 30, 2013 one week after the Court's August 23, 2013 deadline.  Consequently, all claims of privilege as to those documents have been waived.

**ARGUMENT**

I.    **THORPE AND HAMRICK HAVE IMPLICITLY WAIVED THE ATTORNEY-CLIENT PRIVILEGE IN CONNECTION WITH THEIR COMMUNICATIONS WITH SUCCESSOR COUNSEL**

    **A.**    **By Bringing a Legal Malpractice Action against Cross & Bennett and Asserting That Their Services Had No Value, Thorpe and Hamrick Have Waived the Attorney-Client Privilege**

The attorney-client privilege is to be narrowly construed.[2] *Comm. Of Rev. v. Comcast Corp.,* 453 Mass. 293, 304, 901 N.E.2d 1185 (2009). The burden of proving the applicability of the privilege, including the burden of demonstrating that the privilege has not been waived, falls on the party asserting the privilege. *Matter of the Reorganization of Elec. Mut. Liab. Ins. Co.,* 425 Mass. 340, 351-52 (1985). The attorney-client privilege may be impliedly waived when a litigant injects certain claims or defenses into the action. *Clair v. Clair*, 464 Mass 205, 219, 982 N.E. 2d 32, 42 (2013). When a party has affirmatively placed protected information at issue, it is unfair to the opposing party to not disclose the information fully. "Were the law otherwise, the client could selectively disclose fragments helpful to its cause, entomb other (unhelpful) fragments, and in that way kidnap the truth-seeking process." *In re Keeper of Records*, 348 F.3d 16, 24 (1st Cir. 2003). It is immaterial whether the litigant injects protected information through a claim for damages or a defense. *Clair*, 464 Mass at 220, n. 32, 982 N.E. 2d at 44.

---

[2]    In this diversity action, Massachusetts privilege law determines whether the attorney-client privilege protects Thorpe and Hamrick's communications with successor counsel. Fed. R. Evid. 501 ("(I)n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."). Massachusetts is both the forum state and the state with the most significant relationship with the communications at issue. Thorpe and Hamrick, residents of Arkansas and Florida respectively, retained Pennsylvania counsel (and briefly Florida counsel) to litigate a matter all knew was being handled, and would be concluded, in Massachusetts.

    Even if a state with a more significant relationship with the communications existed, under the Restatement (Second) of the Conflict of Laws, Massachusetts law would still apply (in choice of law questions, Massachusetts looks to the Restatement, *Feeney v. Dell, Inc.,* 454 Mass 192, 206, 908 N.E.2d 753, 766 (2009), and on privilege issues, §139 is authoritative. *See, VLT Corp. v. Unitrode Corp.*, 194 F.R.D. 8, 16 (D. Mass 2000)). Under § 139(b), the law of the forum state should apply unless there is a "special reason" to apply another jurisdiction's law. Here, Massachusetts has the greatest interest in deciding whether persons who have voluntarily chosen to litigate within its borders have waived their rights.

    The question of which state's law should apply to the privilege dispute is, of course, distinct from which state's law substantive law should decide the dispute. Restatement § 139, comment e.

Post settlement disputes where clients refuse to pay former lawyers who contributed to a successful result is a recurring scenario where clients have been found to have waived the privilege.  The work performed by each attorney is relevant to determining the compensation owed to everyone who contributed.  Similarly, legal malpractice allegations can only be decided by examining the actions (or inactions) of every lawyer who could have caused (or cured) the harm.  Massachusetts has a straightforward rule in these cases: "in cases . . . in which a client sues a former attorney for malpractice, the attorney-client privilege is waived as to communications with all attorneys involved in the underlying litigation in which the malpractice allegedly occurred." *Zabin,* 141 Mass App. at 157-58; 896 N.E. 2d at 955-56.

*Zabin* leaves no question that by pursing malpractice claims against Cross & Bennett, Thorpe and Hamrick have waived protection for their communications with successor counsel. Zabin was a trial attorney employed under a contingency fee agreement who had secured a substantial trial verdict for the Picciotto family and who had initiated bad faith litigation after the defendants' insurer declined coverage.   After dedicating years to the case, he was discharged. Ultimately, the bad faith lawsuit resulted in a multi-million dollar settlement.  The family refused to pay Zabin, claiming the settlement was the result of the work of the attorney who represented them at the conclusion of the case, Casher.  The family pursued malpractice claims against Zabin, who sought discovery from Casher.  The trial court ruled that Zabin was entitled to discover the communications between Casher and the Picciottos in the underlying litigation.

Affirming, the Massachusetts Appeals Court found that the Picciottos had implicitly waived the right to assert the attorney-client privilege.  The Court recognized that the central issues in the dispute were: "(1) what services each [attorney] furnished on behalf of the [clients] during the period of engagement, (2) how those services contributed to the settlement . . . , and

(3) whether any of the [attorneys] committed malpractice in the course of providing those services." *Id.* at 157, 955.  It also noted the Picciottos' position that Zabin had contributed little to the ultimate settlement.  It had no difficulty concluding that "[t]he nature of the defendants' allegations placed the work Casher performed in the underlying litigation directly at issue."[3]

The issues in dispute here are identical to those in dispute in *Zabin*, and Thorpe and Hamrick have made the same contention as the Picciotto family: that the work of the original counsel had little contribution to the ultimate settlement.  Also, the merits of several of the malpractice claims depend on what successor counsel did or, more frequently, did not do.[4]  This Court should join the Southern District of Texas in finding that Thorpe and Hamrick waived their attorney-client privilege "when [they] sued Cross & Bennett for malpractice."  Exhibit 25.

**B.      As a Result of Thorpe and Hamrick's Waiver, Cross & Bennett Are Entitled to Receive the Emails and Other Communications between Thorpe and Hamrick and Successor Counsel.**

Massachusetts jurisprudence holds that when a party has implicitly waived the attorney-client privilege by injecting claims and defenses that necessarily encompass privileged communication, the waiver is limited to the matters that have been put "at issue."  *Clair v. Clair*, 464 Mass at 219, 982 N.E. 2d at 43-44.   Further, no disclosure will be permitted unless the privileged information sought to be discovered is not available from any other source.  *Id.*  Once again *Zabin* establishes that both of these conditions for disclosure have been met in this case.

---

[3] In support of its position, the Appeals Court cited *Bieter Co. v. Blomquist,* 156 F.R.D. 173, 176–179 (D. Minn. 1994); *Rutgard v. Haynes,* 185 F.R.D. 596, 597–600 (S.D. Cal.1999); and *Pappas v. Holloway,* 114 Wash.2d 198, 202–209, 787 P.2d 30 (1990). *See Waite, Schneider, Bayless & Chesley Co., L.P.A. v. Davis*, 2013 WL 4757486 (S.D. Ohio) (July 12, 2013) at *12-13.

[4] Thorpe and Hamrick claimed Cross & Bennett were fired "for cause" because Cross refused to renegotiate the sharing agreement with Phillips & Cohen.  But the same grounds for renegotiation were available to successor counsel and they never attempted to renegotiate either.  Thorpe and Hamrick claim they were harmed when they were not allowed to review documents in the government's possession because Cross allegedly misrepresented the terms of a protective order.  But once successor counsel learned Thorpe and Hamrick could have access to the documents, it appears that neither they nor successor counsel ever reviewed them.  Thorpe and Hamrick also claim it was malpractice for Cross & Bennett to not emphasize the claims relating to Paxil in their discussions with the U.S. Attorney's Offices.  But successor counsel had the same opportunity, was unable to provide much factual support for the allegations, and the Paxil claims were a small percentage of the final settlement.

In *Zabin*, the Appeals Court affirmed the trial court's determination that the appropriate scope of the implied waiver was all communications relating to the underlying litigation. 73 Mass. App. at 158, 896 N.E. 2d at 955.  The waiver was appropriately limited because it did not extend to the preparation of the malpractice/fee dispute case.  Cross & Bennett seek no more than was permitted in *Zabin*.  They do not claim any right under this theory to communications relating to the malpractice/fee dispute claims—only to those communications with counsel who succeeded Cross & Bennett in the underlying litigation.

*Zabin* also establishes that when the actions of successor counsel have been inserted into the case, the only source of the necessary information is successor counsel and her file.  *Id*.  In this case, successor counsel's file is the only way to determine what was done after Cross & Bennett was discharged—yet almost all of the file documenting what successor counsel did has been withheld.  For example, by Cross & Bennett's count, Kenney & McCafferty has identified 13,111 emails relating to their representation of Thorpe and Hamrick.  But Thorpe and Hamrick have only produced 278, many of which were between Kenney & McCafferty and Keith Cross (or Cross's attorney).  Excluding emails to and from Cross & Bennett or their counsel, no Kenney & McCafferty emails have been divulged from prior to April 4, 2012, a date more than two years after Kenney & McCafferty was retained.  Nor have any substantive time records been produced.[5]  Cross & Bennett must have the complete file to prove the value of their services.

It is not possible for Cross & Bennett (or anyone else) to use the privilege log provided by Thorpe and Hamrick to identify allegedly privileged documents that are not germane to the malpractice/fee dispute.  For each document, the log only identifies the date of the

---

[5] Thorpe and Hamrick have produced tables summarizing how many hours professionals at Kenney & McCafferty devoted to the qui tam litigation each month, but none of these records describe what the professionals actually did.

communication and the senders and recipients.[6]  Thorpe and Hamrick had the duty to establish a privilege for each and every document withheld by identifying the nature of each communication.  Their failure to do so prevents the parties from narrowing the production of documents and is a further reason for finding that the privilege was been waived.

Thorpe and Hamrick have taken the position that Cross & Bennett's work had no value, and that Cross & Bennett caused the record-setting settlement to be lower than it should have been.  Only if Cross & Bennett can determine what successor counsel did to advance the underlying litigation can they contest those claims.  Thorpe and Hamrick are using the attorney-client privilege as a sword, not to protect their right to legal representation.  They must be found to have waived the privilege with regard to successor counsel.

## II.       THORPE HAS ALSO WAIVED THE PRIVILEGE WITH REGARD TO HIS COMMUNICATIONS WITH ATTORNEYS IN 2009

In addition to successor counsel Nolan & Auerbach and Kenney & McCafferty, Thorpe conferred with several other law firms in 2009.[7]  Thorpe and Hamrick have placed those communications at issue, thereby waiving the privilege, because they contend they only "discovered" Cross & Bennett's malpractice due to these communications.  Additionally, they waived the privilege with regard to Thorpe's communications with these firms because of partial disclosure to Keith Cross and selective disclosure of discovery documents.

---

[6] It appears that Thorpe and Hamrick have not done reviews of the communications claimed to be privileged.  All 13,738 entries in their privilege log describe documents as "Conf. Communications Involving Legal Advice Prepared for Litigation."  This boilerplate legend does not establish the listed communications' privileged nature.  By failing to do a review with any detail, they have asserted privilege inappropriately over many documents, including emails copied to Keith Cross and emails between Brian Kenney's assistant and the Expedia travel website.

[7] To the knowledge of Cross & Bennett, those law firms are: Getnick & Getnick of New York City, New York; Starrs, Mihn & Pulkrabek, LLP of Denver, Colorado; The Rufner Law Firm of Centennial, Colorado; and BurgSimpson of Denver, Colorado.

**A.      By Relying on Their 2009 Conversations with Other Attorneys to Avoid the Two Year Statute of Limitations, Thorpe and Hamrick Have Waived the Privilege**

Almost all of the acts of alleged malpractice occurred between August 2002 and January 2007.  Ordinarily, these claims would be barred by the two year statute of limitation in Colorado.[8]  C.R.S. §13-80-102(1)(a).  In Colorado, a cause of action accrues "on the date both the injury and its cause are known or should have been known by the exercise of reasonable diligence."  C.R.S. §13-80-108.  A claim for legal malpractice accrues "when plaintiffs learn 'facts that would put a reasonable person on notice of the general nature of damage and that the damage was caused by the wrongful conduct of an attorney.'" *Morrison v. Goff*, 91 P.3d 1050, 1053 (Colo. 2004), quoting *Broker House Int'l, Ltd. v. Bendelow,* 952 P.2d 860, 863 (Colo.App.1998); *see Morris v. Geer*, 720 P.2d 994 (Colo.App.1986) ("[W]hat is critical in determining when a legal malpractice action accrues is knowledge of the facts essential to the cause of action, not knowledge of the legal theory upon which an action may be brought.").[9]

Thorpe and Hamrick have consistently claimed that they only learned of negligence by Cross & Bennett in late 2009.  In their termination letter to Cross, dated October 21, 2009, attached as Exhibit 12, they stated <u>"(o)nly recently</u>, upon speaking with at least three separate attorneys in September and October of 2009…did Mr. Thorpe find out" (emphasis in original) about possible malpractice, and that "these issues only came to the attention of Relators Thorpe and Hamrick while talking to expert attorneys in September and October of 2009."  The claim of belated discovery is affirmatively pleaded in their malpractice complaint,[10] and was also alleged

---

[8] Massachusetts applies the statute of limitation of the state having the most significant relationship to the parties and the occurrence.  *Neiman v. Hyatt Corp.*, 441 Mass. 2004, 808 N.E. 2d 290 (2004).  Colorado has the most significant relationship to a claim against a Colorado attorney prosecuting an action in Colorado federal court.
[9] Colorado does hold that a statute of limitation is tolled during an attorney's continuing representation of a client.  *Broker House Int'l, Ltd. v. Bendelow,* 952 P.2d 860, 864 (Colo.App.1998).
[10] *See*, Complaint, ¶ 167: "In the course of consulting other qui tam lawyers, Thorpe and Hamrick

13

in support of their recent attempt, in the United States District Court for the District of Columbia, to obtain work product and attorney-client documents in the possession of Phillips & Cohen.[11]

The validity of Thorpe and Hamrick's effort to avoid the two year statute of limitation hinges on whether they learned "essential facts" previously unknown to them in these communications or whether they merely learned a legal theory of liability.  Cross & Bennett cannot defend against their invocation of the discovery rule unless they can obtain discovery of what was communicated in these conferences.  By relying on protected communications to avoid the statute of limitations, Thorpe and Hamrick have implicitly waived the attorney-client privilege.  *See e.g., Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989). The privilege has been waived because the otherwise privileged conversations constitute the "discovery;" there is no non-privileged information to examine.  *See Pyramid Controls, Inc. v. Siemens Indus. Automations, Inc.*, 176 F.R.D. 269, 274-75 (N.D. Ill. 1997) (privilege waived when what attorney told client determines whether discovery rule applies); *see also McCarthy v. Slade Associates, Inc.*, 463 Mass 181, 192, 972 N.E. 2d 1037, 1047 (2012), and cases cited therein.

Thorpe and Hamrick contend that any waiver should be limited to communications with Joel Androphy, whose documents have already been ordered to be produced by the U.S. District Court for the Southern District of Texas.  But the claim that only Androphy gave them the necessary evidence of malpractice is at odds with contemporaneous emails and recent filings.

- The October 21, 2009 termination letter states that Thorpe and Hamrick learned of the malpractice "upon speaking with <u>at least three separate attorneys</u>" and after speaking with "<u>at least three experts</u> at qui tam law" (emphasis added).  Exhibit 12 at 2, 4.

---

discovered that Cross's legal advice concerning the effect of the GSK/Thorpe release was erroneous; that Cross mishandled the Original Complaint and the First Amended Complaint; and that Cross put his own interests ahead of his clients' interests when he negotiated the sharing agreement with P&C."

[11] *See* Plaintiffs' Opposition To Phillips & Cohen LLP's Motion to Quash or , In the Alternative, for Protective Order, at copy of which is attached as Exhibit 26, at 2: "The victims of this gross negligence and subsequent cover-up discovered their unfortunate plight only when, in late 2009, they. . .began interviewing experienced *qui tam* lawyers to assist them."

- In two separate places in the same letter, Thorpe and Hamrick claim the discovery conversations with other counsel occurred in September and October 2009.  By the end of September, however, Androphy had informed Thorpe and Hamrick that he would not represent them (unless Cross & Bennett remained in the case).  *See* September 29, 2009 email from Greg Thorpe to Keith Cross, attached as Exhibit 6.  Any conversations in October 2009 were with someone other than Androphy.

- On October 2, 2009, Thorpe emailed Cross to inform him that he had only recently "discovered in totality" the extent of the malpractice "after talking to several experts in qui tam law" and that "only yesterday" law firms in "Manhatten [sic] and Los Angeles" gave him opinions that Cross breached their contingency fee agreement.  See October 2, 2009 email from Greg Thorpe to Keith Cross, a copy of which is attached as Exhibit 8.  Androphy's office is in Houston, Texas.

- In their answers to interrogatories, executed on March 18, 2013, both Hamrick and Thorpe identify Marcella Auerbach as one of the attorneys, in addition to Androphy, who informed them of Cross & Bennett's mistakes.  *See* Answer to Interrogatory 11, Responses to First Set of Interrogatories From Gregory Thorpe and Blair Hamrick, attached as Exhibits 21 and 22.

- In their malpractice complaint and their opposition to Phillips & Cohen's motion for a protective order, Thorpe and Hamrick state that they conferred with "qui tam lawyers," not just an individual attorney.

So long as Thorpe and Hamrick rely on the defense that they did not know about malpractice until 2009, Cross & Bennett need access to every communication which allegedly caused Thorpe and Hamrick to discover their claimed malpractice.

### B.   Thorpe and Hamrick Have Waived the Privilege Through Selective Disclosure of the Legal Advice Thorpe Received in Late 2009

It is fundamental that disclosure of attorney-client communications to a third party undermines any protection from non-disclosure a privilege holder might otherwise enjoy. *Cavallaro v. United States*, 284 F. 3d 236, 246-47 (1st Cir. 2002).  Equally fundamental is the proposition that disclosure of part of a privileged communication, in fairness, requires disclosure of the remainder.  *In re Von Bulow*, 828 F. 2d 94, 102 (2d Cir. 1987).[12]  Both principles apply given Thorpe's repeated disclosures to Cross of advice Thorpe received in late 2009.

---

[12] This rule may not apply if the disclosure is made outside a litigation context, and is not subsequently used by the client in litigation.  *Von Bulow*, 828 F.2d at 102; *In re Keeper of the Records*, 348 F.3d at 24-26.  Nonetheless,

Even after they purportedly learned of Cross & Bennett's "gross malpractice" from Androphy in September 2009, Thorpe and Hamrick did not discharge Cross, but sought to bring Androphy into the case as co-counsel and to keep Cross at a substantially reduced fee.  In late September, Cross informed Thorpe and Hamrick that he would not further reduce his fee, and Androphy told them he was not interested in entering the case without Cross' involvement. Thereafter, instead of firing Cross & Bennett, Thorpe sought to intimidate Cross into either withdrawing (which might result in Cross & Bennett forfeiting its right to compensation), or abandoning its right to compensation.  Thorpe sought to convince Cross that he had overwhelming evidence of malpractice, supported by the opinions of numerous qui tam experts. In a series of emails, Thorpe revealed communications which would otherwise be privileged:

- "I cannot find any competant [sic] attorney that would agree with your inflated sense of self worth. . . No attorney I talked to would have filed our Original complaint, without including state claims, the retaliation claims and the illegal kickback claims that I gave to you."  September 30, 2009 email from Greg Thorpe to Keith Cross, attached as Exhibit 7.

- "Your conduct, not only recently, but repeatedly over the years has been true malpractice, in my opinion. This opinion was only recently really "discovered in totality" by me, after talking to <u>several experts in qui tam law</u>. . . .

    "You also need to know that after talking to prominent, knowledgeable firms in Manhatten [sic], and Los Angeles only yesterday that I have opinions that not only have you breached [sic] your Contingency Agreement for 40%, and should have taken the Androphy offer but:

    "Since the real reason we lost claims as "first to file" is your shoddy work in our Original Complaint-you are liable.

    **"Therefore, and <u>this is not my opinion</u>, you may be held liable for the 50% that we were forced to give up to the second to file and if you do the math at say a 2 billion dollar civil settlement. It is possible that you could be responsible for the 170 million dollars we have to give them at a 17% award on 2 billion dollars. So not only would you get nothing, you would owe us what was wrongfully taken from us due to your malpractice. In other words, my friend, competant [sic]**

---

threatening Cross & Bennett with malpractice claims is clearly conduct within a litigation context.  Moreover, Thorpe and Hamrick rely on the disclosed communications in this litigation to support their position that Cross & Bennett were fired "with cause" and to parry the claim of bad faith termination.

**Counsel said that you could be responsible for a 170 million dollars in DAMAGES. This is not my analysis, I did not even think of that. . . .**

"We only needed them (Phillips & Cohen's clients), had to sign up with them and were forced to give them half the case because of your negligence-not only in the Original complaint, but failing to immediately cover your errors in an amended complaint. . . .

"…These are expert opinions."  Email dated October 2, 2009 from Greg Thorpe to Keith Cross, a copy of which is attached as Exhibit 8 (emphasis in original).

- "Current counsel is concerned that the delay in admitting mistakes, especially with the 3730(h) claims is for possible statute of limitations regarding filing 'malpractice' cases against you [sic]. . . .In the end, you may get nothing and I am not sure you deserve anything after talking to other counsel."   October 9, 2009 email from Greg Thorpe to Keith Cross, attached as Exhibit 9.

- "We have come to know through Counsel that you will not answer any questions we have concerning any possible malpractice issues, . . . As you are aware it was not until I started talking to several other compatent [sic] FCA attorneys that we became aware of how your conduct has affected our case...not only the real reasons for giving up 50% to Phillips and Cohen and now reneging on the real terms of that agreement regarding the four drugs not included, but the real statute of limitations on 3730 (h) claims. . .

  "I would assume then that the statute of limitations would run from the time we were informed by competant [sic] counsel what was really going on in the areas that concern us, in other words the last month or so. If your opinion differs from opinions we received, please advise."  October 11, 2009 email from Greg Thorpe to Keith Cross, a copy of which is attached as Exhibit 10.

On October 21, 2009, Thorpe and Hamrick discharged Cross & Bennett by email.

Attached to the email, however, was a letter disclosing additional communications from "at least three separate attorneys."  In addition to the allegations summarized above, the letter alleges:

- "other competent Attorney(s)" had advised that Cross & Bennett had provided erroneous information to Hamrick regarding his retaliation claims against GSK;

- that Cross did not possess the necessary skill, experience and knowledge to handle the qui tam action "according to several experts in FCA qui tam law;"

- "competent Counsel" agreed with Thorpe that Cross & Bennett should have charged Phillips & Cohen with stealing confidential information from Thorpe;

- that "at least three experts in qui tam law" told Thorpe that the reason Cross & Bennett did not oppose a Sharing Agreement with Phillips and Cohen was because his initial complaint was defective and that Cross was attempting to hide his negligence; and

- that "competent third party counsel" had informed Thorpe that the statute of limitations for his § 3730(h) claim had run and that the advice they received from counsel let them know that Cross should be fired "for cause."

The screed concludes by denying that Cross should be paid anything for his work, and that he might face formal malpractice claims and disciplinary complaints "depending on the response of Mr. Cross." See Exhibit 12 at pp. 2-5.

Even after discharging Cross & Bennett, Thorpe continued to disclose communications with counsel, including those with Marcella Auerbach. On October 22, he wrote:

> I am amazed as is current counsel Auerbach regarding your recent acts of desperation, which he [sic] exposed after we got competent Counsel. . . . Our attorney has 25 years as a prosecutor in the Department of Justice. She cannot believe your past and continuing malpractice or your attempt to divide your clients who are supposed to be jointly represented. It seems that you also violated my attorney client privileges . . . . She (Auerbach) at least has the class and knowledge to keep all of her clients [sic] information privileged. . . .

> You need to think about your situation, as [sic] if any more happens that I deem detrimental to our case..**one thing**-you will have done it to yourself. You hold your own future as to how you behave, post termination. My legal options are endless, and could be highly detrimental to your future in the legal profession. (not just my opinion).[13]

Exhibit 13 (emphasis in original). Eight days letter, Thorpe sent yet another email to Cross disclosing the content of communications with his new attorneys: "You have cost us 80% of the case through incompetance [sic] and malpractice, with several top attorneys agreeing, which we just found out." Exhibit 15. Both of these emails threaten malpractice claims and efforts to deny Cross any compensation if he does "one more thing" which Thorpe deems harmful.

At the time Thorpe made these disclosures of otherwise-privileged communications, he knew that disclosure of confidential attorney communications waived the privilege.[14] Thorpe's

---

[13] In his answers to interrogatories, Thorpe identifies the persons who agreed with his opinions regarding his legal options and their detrimental nature as Auerbach, Androphy and Sarah Frazier, an attorney who worked with Androphy. Exhibit 21, Answers 9, 12 and 13.
[14] In March 2008 Thorpe conferred with Steven Cohen and Mark Kleiman, two attorneys who had successfully settled an off-label promotion qui tam case against Merck. He told Keith Cross that he could not disclose what he had talked about due to the attorney-client privilege. Exhibit 4.

disclosures were not inadvertent, but part of a deliberate strategy to try to intimidate Cross into not pursuing his claim for compensation after seven years of work.  The disclosure of these professional opinions was intended to make credible Thorpe's threats to expose Cross to malpractice actions, disciplinary complaints and professional disgrace.  They were also being used then (as now) to support Thorpe's contention that he had cause to fire Cross & Bennett and that he had not discharged them in bad faith to avoid paying the contingency fee.

Thorpe cannot wield favorable snippets from his communications with independent counsel as a cudgel to batter Cross without allowing Cross & Bennett to see what was really communicated.  This is particularly true because an inaccurate or exaggerated statement of a privileged communication waives the privilege with respect to the true communication, even if the inaccurate statement is extrajudicial and is not being used by a party in subsequent litigation. *United States v. Jacobs*, 117 F. 3d 82, 89-90 (2d Cir. 1997); *see United States v. Mendelsohn*, 896 F. 2d 1183, 1188-89 (9th Cir. 1990).

Once Thorpe disclosed to Cross the advice he had allegedly received from the numerous attorneys he had contacted, he waived the privilege with regard to those conversations.  Further, Cross & Bennett are entitled to determine whether Thorpe's reporting is accurate or honest.  All communications with various attorneys consulted prior to October 30, 2009 have been waived.

**C.    Thorpe and Hamrick Have Also Waived the Privilege With Regard to Lawyers Contacted in 2009 Through Their Selective Disclosure of Discovery Documents**

Selective disclosure of attorney-client communications has continued during the discovery process.  Thorpe and Hamrick have chosen to selectively disclose certain documents in

discovery relating to Thorpe's 2009 discussions with successor counsel and malpractice counsel. Several of these documents are attached as Exhibits 14, 16, 17 and 18.[15]

Thorpe and Hamrick cannot selectively produce those attorney-client communications which support their story and then claim the attorney-client privilege prevents them from disclosing the remainder.  Under Fed. R. Ev. 502(a), when there has been an intentional waiver of privileged communications in a federal proceeding, the disclosure of undisclosed communications concerning the same subject matter must be produced when, in fairness, the disclosed and undisclosed communications must be considered together.  There is never a judicial disclosure where it is fair to selectively disclose only those documents that support your position and to sequester the remainder.  *In re Keeper of Records*, 348 F.3d at 24.

Thorpe and Hamrick's selective disclosure requires all attorney-client communications from 2009 to be produced.

## CONCLUSION

Wherefore, for the reasons described above, all communications between Gregory Thorpe and/or Blair Hamrick and Kenney & McCafferty or Nolan & Auerbach must be produced.  In addition, all communications between Gregory Thorpe and any other counsel with whom he conferred in 2009 must also be produced.

---

[15] In an October 22 email from to Auerbach, Exhibit 14, Thorpe purports to describe why Cross recommended the Phillips & Cohen sharing agreement as well as purportedly depicting lies told by Phillips & Cohen's counsel.  In two emails, Exhibits 16 and 17, Thorpe explains to his lawyers the difference between charging and retaining liens in Colorado and instructs his counsel on the deficiencies of Cross & Bennett's attorneys lien under Colorado law. Thorpe's initial letter to Brian Kenney, dated December 14, 2009 and attached as Exhibit 18, repeats many of the malpractice allegations initially communicated to Androphy, but admits that it is likely that the statute of limitations has run on many of the malpractice claims.

Respectfully submitted,

KEITH CROSS, JOSEPH BENNETT, and
CROSS & BENNETT, L.L.C.

By their attorneys,

/s/Michael Tabb
Thomas M. Greene (BBO # 210020)
tgreene@greenellp.com
Michael Tabb (BBO # 497310)
matabb@greenellp.com
Ryan P. Morrison (BBO # 680238)
rmorrison@greenellp.com
Sarah E. Godfrey (BBO # 625041)
sgodfrey@greenellp.com
Margaret N. Rosenberg (BBO # 675614)
mrosenberg@greenellp.com
GREENE LLP
One Liberty Square, Suite 1200
Boston, MA  02109
(617) 261-0040

and

George A. Berman (BBO # 040200)
Alan K. Tannenwald  (BBO # 672375)
PEABODY & ARNOLD LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210
(617) 951-2100
gberman@peabodyarnold.com
atannenwald@peabodyarnold.com

## CERTIFICATE OF SERVICE

I hereby certify that, on October 1, 2013, this document (filed through the ECF system) was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: October 1, 2013                    /s/ Michael Tabb
                                          Michael Tabb