IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GREGORY W. THORPE, *et al.*

            Plaintiffs

    v.

CROSS & BENNETT, LLC, *et al.*

           Cross & Bennett

CASE NO. 12-cv-11632-RWZ

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO CROSS & BENNETT'S
MOTION TO COMPEL PRODUCTION OF THORPE AND HAMRICK'S
COMMUNICATIONS WITH SUCCESSOR COUNSEL**

Plaintiffs Gregory Thorpe and Blair Hamrick (collectively "Plaintiffs"), by their

undersigned counsel, submit this memorandum of law in opposition to Cross & Bennett's

Motion to Compel Production of Thorpe And Hamrick's Communications With Successor

Counsel (the "Motion") filed by defendant Cross & Bennett. Defendants Keith Cross, Joseph

Bennett, and Cross & Bennett L.L.C. will be referred to collectively in this Memorandum of Law

as "Cross & Bennett" or as "Defendants".

## <u>COUNTER-STATEMENT OF FACTS</u>

In lieu of an accurate statement of the facts that are material to their Motion, Cross &

Bennett set forth a jumble of assertions that, for the most part, are irrelevant to the matter before

the Court, and many of which are plainly untrue. We begin by reviewing the facts that are

actually material to the present Motion.

This case arises from the retention of Cross & Bennett by Plaintiffs to represent them in

the largest False Claims Act litigation in U.S. history. The relationship between Plaintiffs and

Cross & Bennett began with Cross & Bennett's representation of Greg Thorpe as employment

1

counsel in a dispute with Mr. Thorpe's then employer GlaxoSmithKline, LLC ("GSK") in September of 2001. The relationship expanded in August of 2002 to include Cross & Bennett's representation of Mr. Thorpe, and Blair Hamrick in November of 2002, in bringing a False Claims Act suit against GSK.[1]

Cross & Bennett's initial complaint on behalf of Plaintiffs, alleging nationwide illegal conduct by one of the largest pharmaceutical manufacturers in the world, was all of 12 pages in length.[2] *United States ex rel. Greg Thorpe et al. v. GlaxoSmithKline PLC, et al.*, C.A. No. 1:03-cv-00008-WYD-BNBC (which, together with the consolidated action before this Court at 03-10641-NG-RWZ, is referred to as the "Qui Tam Litigation"). The complaint asserted no claims under state law, and though it referenced instances of kickbacks to doctors, contained no separate claim for the violation of anti-kickback laws. Approximately six months after filing this complaint, Plaintiffs and Cross & Bennett learned that other relators, represented by Phillips & Cohen LLP, had filed a similar – and far more comprehensive – suit against GSK. The paucity of Cross & Bennett's initial complaint placed Plaintiffs in dire jeopardy of losing their position as first-filed relators. But Cross & Bennett chose to obfuscate this fact with half-truths and outright misrepresentations regarding the significance of the Phillips & Cohen complaint. Instead of disclosing the true situation to their clients, Cross & Bennett convinced Plaintiffs that the value of Phillips & Cohen's involvement in the litigation warranted Plaintiffs entering into a sharing agreement with the relators represented by Phillips & Cohen on terms unfavorable to Plaintiffs. Indeed, Plaintiffs gave up  half their potential relator's share – an amount greatly in

---

1 Cross & Bennett would later file retaliation claims against GSK pursuant to section 3730(h) of the False Claims Act on behalf of Plaintiffs.

2 And contrary to Cross & Bennett's arguments, Plaintiffs were senior sales representatives with decades of combined experience, and first-hand knowledge of multiple nationwide programs whereby GSK illegally marketed its products.

excess of any reasonable sharing agreement had Cross & Bennett filed an adequate initial complaint. Once that agreement was secured in early 2004, Cross & Bennett were content to ride the coattails of Phillips & Cohen and the United States, in the process ignoring the wishes of their clients regarding the direction they wished the litigation to take.

In the fall of 2009, frustrated by Cross's handling of certain aspects of their case, Thorpe and Hamrick sought independent advice on three issues of great importance to them: (1) their retaliation claims against GSK; (2) their desire to press the United States to further investigate GSK's illegal marketing of certain drugs; and (3) the need to address with Phillips & Cohen the fact the sharing agreement did not cover certain drugs.

Plaintiffs approached a number of different firms across the country, and the first with whom they had any substantive discussions was Berg & Androphy on or about September 7, 2009. It was during these discussions that Plaintiffs first discovered that Cross & Bennett's conduct, and particularly the deficiencies of the original complaint, had caused them substantial harm.

Notwithstanding this, Plaintiffs did not immediately terminate Cross & Bennett's representation. Over the following several weeks, Plaintiffs sought Cross's agreement to retain Berg & Androphy as co-counsel. Cross rejected these attempts. Seeing little choice but to terminate Cross & Bennett at that point, Plaintiffs sought new counsel to replace Cross & Bennett. This led Plaintiffs to contact Nolan & Auerbach on or about October 1, 2009. Cross & Bennett was terminated by letter dated October 21, 2009.

Nolan & Auerbach agreed to represent Plaintiffs upon the termination of Cross & Bennett, and did so until mid-December 2009. At that time they were replaced by the law firm

of Kenney & McCafferty who continue to serve as Plaintiffs' Qui Tam counsel to the present day.

In addition to the three firms mentioned above, Cross & Bennett's Motion also makes reference to four "other counsel", including but not limited to: Getnick & Getnick; Starrs, Mihn & Pulkrabek; The Rufner Law Firm; and Burg Simpson. Importantly for the present Motion, none of these firms ever served as "successor counsel" to Cross & Bennett. Getnick & Getnick was first contacted by Plaintiffs on or about October 1, 2009, weeks after talking to Androphy, as part of the effort to obtain successor counsel, but Plaintiffs had no substantive conversations with this firm beyond the initial request for representation. The remaining firms on the list, Starrs, Mihn & Pulkrabek, The Rufner Law Firm, and Burg Simpson, were contacted between late October through early November of 2009 to represent Plaintiffs with respect to their malpractice claims against Cross & Bennett. In the cases of Starrs, Mihn & Pulkrabek and Burg Simpson, Plaintiffs, as with Getnick & Getnick, did not have any substantive discussions with them beyond the initial request for representation. These are all facts that Cross & Bennett could easily have learned had they ever asked.[3]

Plaintiffs commenced the present action by filing a complaint on August 31, 2012 alleging numerous acts of malpractice by the Defendants committed during the course of their representation of Plaintiffs as relators in the Qui Tam action. On November 16, 2012 Cross & Bennett filed their First Amended Answer and Counterclaim, in which they asserted a claim for compensation for their services based upon quantum meruit. On November 26, 2012 Plaintiffs answered Cross & Bennett's counterclaim.

---

3. Cross & Bennett never inquired into when these firms were contacted, or for what purpose, before filing the present Motion. Nor did Cross & Bennett ever discuss with undersigned counsel any claim that the privilege with respect to communications with these firms had been waived. As a result, to the extent Cross & Bennett's Motion seeks production of communications with these firms, the Motion is in violation Local Rule 37.1(a), and should be denied for that reason alone.

In defense of Plaintiffs' malpractice claims, Cross & Bennett asserted, among other defenses, the statute of limitations. Anticipating this defense, Thorpe and Hamrick's complaint invoked the discovery rule, and alleged that they were unaware of the harm that Cross & Bennett had caused them until the fall of 2009.

In response to Cross & Bennett's quantum meruit claim, Plaintiffs have asserted as defenses, among others, Cross's malpractice and ethics violations. Plaintiffs have also asserted that the results ultimately achieved in the Qui Tam Litigation were largely the result of work done by counsel other than Cross & Bennett, namely counsel for the United States and Phillips & Cohen, and that Cross & Bennett's efforts, such as they were, were of little or no value to the ultimate resolution of the case. The question of what, if any, value Cross & Bennett's efforts provided can only be answered by looking at what Cross & Bennett did. What successor counsel did or didn't do does nothing to change Cross & Bennett's own actions and inactions. Further, Plaintiffs are producing almost all of the communications between successor counsel and both the United States and Phillips & Cohen.[4] The two amended complaints filed by Kenney & McCafferty are a matter of public record. Cross & Bennett have entirely failed to articulate why they need successor counsel's communications with Plaintiffs in addition to the materials they already have.

While this concludes the Counter-Statement of Facts that are directly relevant to the present Motion, as noted above, Cross & Bennett's Memorandum of Law contains a number of serious misstatements. A point-by-point response to these is inappropriate in this Reply, but

---

4. There is a small subset of communications between Kenney & McCafferty and the United States that Plaintiffs have agreed to produce subject to the United States' right to review the communications to determine whether the United States wishes to assert any privilege claim over them. That subset has been provided to counsel for the United States, but the United States has not yet conducted its review.

because of the false impression that Cross & Bennett attempt to create, we will indicate to the Court three places where their recitation slips from fact into fiction.

1.      In describing the original complaint filed by Cross on behalf of Plaintiffs on January 3, 2003, Cross & Bennett state, "Virtually all of Thorpe and Hamrick's allegations concerned promotion in Colorado and surrounding states."  Cross & Bennett's Memorandum, p. 3.  This contradicts the allegations set forth in the original complaint.  In particular, Defendants included allegations regarding GSK's "Fax Back" program, GSK's "Thought Leader" program, the use of "Regional Medical Scientists" and "Market Development Managers", and the P.R.I.D.E. Program.  The complaint also contains allegations regarding at least two speakers who spoke on off-label subjects nationwide.  All of these were nationwide efforts by GSK, and account for a substantial portion of the substantive allegations of Cross & Bennett's original complaint.[5] While the original complaint was deficient in many respects, as highlighted by the later complaint filed by Phillips & Cohen, those deficiencies did not arise from or include a lack of information regarding the nationwide scope of GSK's activities.

2.      Cross & Bennett's Memorandum of Law notes some of the significant differences between Phillips & Cohen's First Amended Complaint in the Qui Tam Litigation and the complaint filed by Cross & Bennett.  Specifically, Defendants note that, unlike the complaint that they drafted, the Phillip & Cohen complaint contained "claims under eleven state qui tam statutes" and "a separate count for illegal kickbacks."  Cross & Bennett's Memorandum, pp. 3-4.  The clear, and correct, implication is that Phillips & Cohen's complaint was superior to the

---

[5] The original complaint consists of 40 numbered paragraphs.  The first sixteen are allegations identifying the parties, setting forth jurisdiction, and providing general background information.  Four paragraphs deal with a False Claims Act claim brought against three GSK employees who were co-workers of Plaintiffs.  This claim would later be dropped.  Of the remaining 20 paragraphs, only 6 refer to activities occurring only in Colorado.  The other 14 paragraphs allege nationwide conduct, six paragraphs making explicit reference to programs and speakers engaged in nationwide off-label marketing.

complaint drafted by Defendants, thereby explaining, at least in part, the 50/50 sharing agreement between Plaintiffs and Phillips & Cohen's relators. This is a remarkable departure from Cross's explanation of the Phillips & Cohen complaint to Plaintiffs in 2003. At that time, faced with a superior complaint that highlighted the deficiencies of his own efforts, Cross downplayed and failed to explain the significance of the Phillips & Cohen complaint. *See* Exhibit "A", attached hereto ("On the different claims issue, she [Erika Kelton] actually said that she thinks the claims are different because they included the 'state' claims and she thinks the anti-kickback claims are ('a bit') different. **I don't buy a difference in the underlying claims**…."). On October 10, 2003, Mr. Thorpe noted to Cross "Right now their Complaint looks better than ours….Do you think that they believe that they are the ones with the upper hand even though we filed first…?" *See* Exhibit "B", attached hereto. To this concern, Cross replied:

> As I've explained before, it does not matter what the government thinks or says, only a court – in the end – decides the relator's share and it does it on the basis of the timing and content of the ORIGINAL [sic] complaints – not the amended complaint. We've only seen their amended complaint, which has probably been prettied up and expanded well beyond the original complaint.

*Id*. Aside from playing down the importance of Phillip & Cohen's First Amended Complaint, this statement is simply wrong. In evaluating the first to file question, a court would have compared Cross's original Complaint to Phillips & Cohen's First Amended Complaint.

3.       Defendant also characterizes the negotiation between Cross and Phillips & Cohen as a "long negotiation…in which all of the advantages and deficiencies of both complaints were discussed at length with Thorpe and Hamrick." While it is true that many months passed between Plaintiffs learning of the Phillips & Cohen suit and the ultimate execution of a sharing agreement, the actual "negotiation," if it can be called that, merely consisted of Cross, without prior authority from Plaintiffs, essentially offering a 50/50 agreement to Phillips & Cohen in

their first substantive discussion of a sharing agreement. *See* Exhibit "C", attached hereto ("I told [Erika Kelton] that we *might* consider going as low as 50/50 but that we weren't offering that at this point….I believe you [Mr. Thorpe and Mr. Hamrick] ought to given some serious consideration to a 50/50 split." (emphasis in original)). Unsurprisingly, Phillips & Cohen accepted that agreement ten days later. *See* Exhibit "D", attached hereto ("Erika Kelton said that they would be willing to do a 50/50 split, which, as I said before, I do not think is unreasonable in light of all of the things we've talked about even though as first to file we could possibly be able to cut them out completely."). The rest of the "long negotiation" consisted of Cross browbeating his clients, first regarding the advantages and necessity of cutting a deal with Phillips & Cohen (though without fully explaining the primary reason – the deficiencies of Cross's original complaint), and later into agreeing to the 50/50 split. The implication of Defendants' Memorandum of Law, that a hard fought agreement was reached only after Plaintiffs were fully informed, is simply not the case. In reality, after the single exchange with Ms. Kelton in October 2003, the actual share division was *never* discussed again with Phillips & Cohen. These are only a few examples of the ways in which Cross & Bennett have re-written history in their Motion in an inappropriate – in so far as it is irrelevant to the Motion – effort to poison the record.

# ARGUMENT[6]

Cross & Bennett's Motion seeks the production of all communications between Plaintiffs and their successor counsel in the Qui Tam Case, as well as with various other counsel not retained to represent Plaintiffs in the Qui Tam Case. Cross & Bennett advance four arguments in support of this request:

1. Cross & Bennett are entitled to all privileged communications with successor counsel under the decision of the Appeals Court of Massachusetts in *Zabin v. Picciotto*, 73 Mass. App. Ct. 141, 896 N.E.2d 937 (Mass. App. 2008), which Cross & Bennett argue has created an automatic and total waiver of the attorney-client privilege;

2. Cross & Bennett are entitled to all privileged communications with successor counsel, and various other counsel, on the theory that Plaintiffs have put those communications "at issue" in this litigation;

3. Cross & Bennett are entitled to privileged communications with successor counsel as well as "other law firms" as a result of Plaintiffs' invocation of the discovery rule regarding the statute of limitations with respect to Plaintiffs' malpractice claims against Cross & Bennett; and

4. Cross & Bennett are entitled to privileged communications with unspecified counsel due to Cross & Bennett's allegation that Plaintiffs intentionally waived the privilege in a series of communications with Cross & Bennett prior to, and immediately following, Plaintiffs' termination of Cross & Bennett as counsel.

We will address these arguments *seriatim*.

---

[6] Copies of all unreported decisions cited herein are attached hereto as Exhibit "F".

## I. THORPE AND HAMRICK HAVE NOT WAIVED THE ATTORNEY-CLIENT PRIVILEGE WITH RESPECT TO THEIR COMMUNICATIONS WITH SUCCESSOR COUNSEL

### A. The Case Law Relied on by Cross & Bennett Does Not Support Their Contention That Thorpe and Hamrick Have Waived the Attorney-Client Privilege

Cross & Bennett rely entirely on *Zabin v. Picciotto*, 73 Mass. App. Ct. 141, 896 N.E.2d 937 (Mass. App. 2008) for their contention that by bringing a legal malpractice claim, Thorpe and Hamrick waived the attorney-client privilege for all communications with attorneys in the underlying litigation.[7] They base this argument on a single statement in the *Zabin* opinion that "in cases… in which a client sues a former attorney for malpractice, the attorney-client privilege is waived as to all communications with all attorneys involved in the underlying litigation in which the malpractice allegedly occurred." *Zabin*, 896 N.E.2d at 955-56. But Cross & Bennett's reliance on *Zabin* is misplaced because they read *Zabin* out of context of the legal framework in which it was decided, and ignore both prior and subsequent case law from the Supreme Judicial Court of Massachusetts and Massachusetts Court of Appeals.

Cross & Bennett posit *Zabin* as, in effect, establishing a single rule applicable to all legal malpractice cases. But *Zabin* does no such thing, a point which is clarified by a subsequent decision of the same court. In *DiPietro v. Erickson*, 2010 Mass. App. LEXIS 865 (Mass. App. April 26, 2010), plaintiff sued his original lawyer for malpractice, claiming that he entered into an unfavorable settlement due to his lawyer's bad legal advice. The defendant sought to depose successor counsel and compel the production of the written communications between successor counsel and plaintiff. Based on *Zabin*, and the very same language relied upon by Cross &

---

7. By definition, this argument applies solely to communications with Nolan & Auerbch and Kenney & McCafferty.

Bennett in the present Motion, the trial court held that the plaintiff had waived the attorney-client privilege with respect to these communications, and ordered discovery to proceed.

On appeal, the Appeals Court of Massachusetts declined to apply *Zabin*. The appellate court rejected the over-broad interpretation of *Zabin* that would, in effect, impose a blanket waiver with respect to all of a client's communications with all attorneys in the underlying litigation in which the malpractice allegedly occurred. *DiPietro* explained that the extent to which the current litigation has put "at issue" the client's communications with his successor counsel entails a fact-specific examination, and that waiver of the privilege is not automatic in an attorney malpractice claim involving successor counsel. *DiPietro v. Erickson*, 2010 Mass. App. LEXIS 865 at *7. In rejecting the same theory that is being advanced by Cross & Bennett here, the Appeals Court recognized that *Zabin* did nothing more than apply the "at issue" doctrine, and an at issue exception does not amount to a "blanket waiver" of all privileged communications. *Id.*; *see also Darius v. City of Boston*, 741 N.E.2d 52, 55-58 (2001); *Clair v. Clair*, 464 Mass. 205, 219 (2013).

*Zabin* is also factually and procedurally distinguishable from this litigation. In *Zabin*, four attorneys who had previously represented the plaintiffs were seeking a portion of the contingent fee due on a $9 million tort recovery that a fifth lawyer had eventually obtained. The plaintiffs in the underlying tort litigation had brought malpractice claims against at least two of their former attorneys. Thus, the case was in essence a battle among five lawyers regarding their respective share of the credit (and blame) for the ultimate result that was reached. In rejecting the claim of attorney-client privilege, a Superior Court judge allowed the former lawyers to depose the lawyer who represented the original plaintiffs at the time of the successful recovery (and who remained their current lawyer). The deposition was subsequently allowed into

evidence at trial.  The Appeals Court of Massachusetts affirmed the decision to allow the deposition to be taken, and its use at trial.

Unlike the situation in *Zabin*, Cross & Bennett are not litigating with other counsel to determine which attorneys deserve which part of the recovery; rather, they are prosecuting their claim for a fee, and defending against a counterclaim of attorney malpractice in which they are the sole defendants.  Cross & Bennett claim that the work performed by each attorney who represented Thorpe and Hamrick is relevant to determining the compensation owed to everyone who contributed.  But only Cross & Bennett's compensation is at issue here.  It is what Cross & Bennett did, and did not do, that will determine the value of their quantum meruit claim, not the actions of successor counsel.

Cross and Bennett argue that "[L]egal malpractice allegations can only be decided by examining the actions (or inactions) of every lawyer who could have caused (or cured) the harm." Cross & Bennett's Memorandum, p. 9.  This is a ridiculous statement.  Legal malpractice is proven or disproven by evidence of the defendant's conduct and the applicable standard of care.   The conduct of successor counsel is immaterial.  Even if this Court were to find that the actions of successor counsel were somehow relevant, the relevant discovery would still be limited to evidence of the actions performed by successor counsel, which in this case would consist of their court filings, their communications with the government, with Phillips & Cohen, and with GSK, not their communications with their clients.  As discussed above, Plaintiffs are producing that information to Cross & Bennett.

In *DiPietro*, as in this case, the defendant did not carry his burden of demonstrating that communications between the clients and successor counsel were at issue and therefore subject to waiver of the attorney-client privilege.  *DiPietro*, 2010 Mass. App. LEXIS 865, at *7-8.  Proof of

Cross & Bennett's malpractice depends on what transpired during the period of their representation of Plaintiffs, and not on any communications that took place many years later with successor counsel. *See Id.*; *Darius*, 741 N.E.2d at 56.[8]

### B. Communications With Successor Counsel Are Not "At Issue" in This Case

The Supreme Judicial Court of Massachusetts has cautioned against finding blanket waiver in cases in which a party claims there has been an "at issue" waiver of the attorney-client privilege. *See Darius v. City of Boston*, 741 N.E.2d 52, 58 (2001); *McCarthy v. Slade Associates, Inc.*, 463 Mass 181, 191-93 (2012).

In diversity cases, the decisions of lower state courts should be given some weight by the federal court, but are not controlling regardless of whether the highest court of the state has spoken on the point in question. *CPC Int'l v. Northbrook Excess & Surplus Ins. Co.*, 962 F.2d 77, 88-89 (1st Cir. 1992) (citing *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967)). *Zabin*, the case relied upon most heavily by Cross & Bennett, is an intermediate appellate court decision, and therefore is not controlling in the present case. *Darius* and *McCarthy*, however, are Supreme Judicial Court decisions, and this Court is bound by their holdings with respect to issues of state law.

In *Darius*, plaintiffs sued a hospital and other defendants for negligence, alleging that their child suffered neurological impairments due to complications during delivery. Defendants moved to dismiss, based on the statute of limitations. In opposition to the motion, plaintiffs

---

8. Cross & Bennett also rely on *Clair v. Clair*, a case that has very little to do with this litigation and is distinguishable. 464 Mass. 205, 219 (2013). *Clair* was a family dispute in which the executrixes of two deceased family members brought an action against the family business challenging the disposition of the business assets. One executrix sought to compel production of business documents and the family resisted. The court held that the attorney-client privilege was waived as to the business' life insurance policies because the business's counterclaim depended on an assessment of one of the decedent's disclosures regarding the life insurance policies. *Clair* was not a case about successor counsel or how multiple attorneys affect the attorney-client privilege. In fact, *Clair* cuts against Cross & Bennett's argument, holding that an "at issue" waiver is not a blanket waiver for the entire attorney-client privilege.

claimed that the statute of limitations tolled until they learned about the potential for negligence from their attorney over three years later. "In both her affidavit and interrogatory answers, [plaintiff] stated that it was not until 'the Spring of 1996,' when she met with her present counsel, that she first learned that the hospital and other defendants caused her child's injuries." *Darius,* 741 N.E. at 53. Defendants claimed that plaintiffs waived their attorney-client privilege by raising the discovery rule, and called for the production of documents relating to the attorney-client relationship and the child's injuries. The lower court granted defendants' motion to compel, but the Supreme Judicial Court reversed.

*Darius* recognized that the attorney-client privilege can be waived, at least partially, by a litigant injecting certain claims or defenses into a case and putting attorney-client communications "at issue." *Darius*, 741 N.E.2d at 55. An "at issue" waiver is found when three conditions exist: "(1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense." *Darius*, 741 N.E.2d at 55 (citing *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975)). Importantly, there can be no "at issue" waiver unless the party seeking to obtain privileged information shows that the information, (1) is necessary to its defense, and (2) the information cannot be derived from any other source. *Darius*, 741 N.E.2d at 58-59. The Supreme Judicial Court of Massachusetts has held that the privilege should be not be waived unless it is "truly necessary to do so." *Id.* at 59.

In making the decision of whether or not it is necessary, the court uses a balancing test, weighing the value of the information against the intrusion on the attorney-client privilege. "Of

course, the more the requested discovery would intrude into the privilege, the greater should be the showing of need and lack of reasonable alternative sources." *Id.*

In the present case, the discovery sought by Cross & Bennett goes beyond any plausible scope of the "at issue" exception to the attorney-client privilege. Cross & Bennett claim that Plaintiffs waived the privilege with respect to *all* otherwise privileged communications by alleging that Cross & Bennett's work had little or no value to the ultimate recovery in the case, to which Cross & Bennett respond that they must know what successor counsel did to defend against this claim. As discussed above, this misstates Plaintiffs' claims. But beyond that, Cross & Bennett's argument is inconsistent with the relief they seek. Cross & Bennett state they need to see what successor counsel *did* to advance the underlying litigation. That information can be learned – entirely – from successor counsels' communications with the United States, Phillips & Cohen, GSK, and by examining the two amended complaints filed by successor counsel.[9] What successor counsel discussed with their clients is *not* relevant to demonstrating what successor counsel actually *did* in the litigation. Nor have Cross & Bennett met their burden to establish why they cannot determine what successor counsel did through other sources – such as the communications between successor counsel, the United States, and Phillips & Cohen, that Plaintiffs are producing.[10]

---

9 All but a small subset of which Plaintiffs have already produced, and Plaintiffs anticipate producing the remaining materials in the coming weeks.

10. Cross & Bennett also complain extensively about Plaintiffs' privilege log. They complain about the length, the type face and the descriptions provided. They complain about the fact that after producing a log of almost 14,000 privileged documents, within one week of completing the production of more than 128,000 pages of documents, Plaintiffs – one week later – produced a supplemental log of an additional 411 documents that had to be coded by hand. These complaints, however, are a side-show and it is notable that Cross & Bennett cites to no authority to support their position. In addressing this issue, it is instructive to refer to the correspondence between counsel on these issues, attached hereto as Exhibit "E".

"An 'at issue' waiver, in circumstances where it is recognized, should not be tantamount to a blanket waiver of the entire attorney-client privilege in the case." *Darius*, 741 N.E.2d at 58. Orders for discovery of privileged information must be limited and carefully crafted to discover only what is actually at issue. Cross & Bennett have not made a showing of necessity, nor can they, and the production of the documents requested would obliterate the attorney-client privilege. Cross & Bennett's Motion must be denied.

## II.     PLAINTIFFS DID NOT WAIVE THE ATTORNEY-CLIENT PRIVIELGE WITH REGARD TO HIS COMMUNICATIONS WITH ATTORNEYS IN 2009

### A.  Cross & Bennett Are Not Granted Access to Privileged Communication by Relying on The Statute of Limitations as a Defense

Cross & Bennett's argument regarding the effect of Plaintiffs' invocation of the discovery rule is predicated on the same "at issue" waiver doctrine discussed above.[11]  The Supreme Judicial Court of Massachusetts held in *Darius* that:

> [W]here a defendant asserts the statute of limitations as a defense and the plaintiff relies on the discovery rule to overcome that defense, the defendant may not, based solely on the plaintiff's invocation of the discovery rule, automatically probe the plaintiff's attorney-client relationship **simply to determine whether the plaintiff may have revealed something to his or her attorneys that might be helpful to the defendant's case.**

*Darius*, 741 N.E.2d at 58 (emphasis added).

In the present case, what was placed "at issue" with regard to the statute of limitations defense is when Plaintiffs *first* learned of Cross & Bennett's malpractice. As discussed above, it is Plaintiffs' contention that occurred during discussions with Berg & Androphy. Cross & Bennett obviously wish to argue that Plaintiffs learned of Cross & Bennett's malpractice on

---

11.  Cross & Bennett fail to correctly articulate the "at issue" waiver doctrine at any point in their Motion, and cite a hodge-podge of out of circuit state and federal case law in this particular section. The only applicable case they cite is *McCarthy v. Slade Assocs.*, 463 Mass. 181 (2012), but they cite it for the proposition that under a fact pattern such as the one here waiver is appropriate. In reality, *Slade* stands for the *opposite* proposition, in conformity with the Supreme Judicial Court of Massachusetts's decision in *Darius*.

some earlier date. What they singularly fail to articulate in their Motion, however, is how communications that occurred *after* the discussions with Berg & Androphy have been placed "at issue" here beyond, as noted by *Darius*, "simply to determine whether the plaintiff may have revealed something to his or her attorneys that might be helpful to the defendant's case." *Darius*, 741 N.E.2d at 58.

Cross & Bennett have not shown entitlement to the discovery of protected communications under a theory of at issue waiver. The Supreme Judicial Court of Massachusetts elaborated upon its holding in *Darius* in *McCarthy v. Slade Assocs.*, 463 Mass. at 191-93. The court reaffirmed that a defendant's assertion of the statute of limitations defense does not, by itself, permit the defendant to intrude on the attorney-client relationship to search for information that helps its defense. *Id*. at 191. Like the defendant in *McCarthy*, Cross & Bennett "have failed to show, as they must, that the 'privileged information sought to be discovered is not available from any other source.'" *Id.* at 192 (citing *Darius*, 741 N.E.2d at 59).

There has been no waiver with respect to the other attorneys Thorpe spoke with in 2009 or afterward, and therefore the Motion to Compel should be denied.

## B. There is no Subject Matter Waiver of The Attorney-Client Privilege for the Legal Advice Thorpe Received in 2009

Cross & Bennett seek the production of all privileged communications Plaintiffs had prior to October 30, 2009 due to a subject matter waiver allegedly caused by various communications from Mr. Thorpe to Cross in September and October of 2009.[12] But Cross & Bennett's argument fails. Cross & Bennett have not articulated a valid reason why fairness

---

12 As an initial matter, this restricts Cross & Bennett's argument to communications with Nolan & Auerbach, because Plaintiffs received no advice from any other counsel in that time period other than Berg & Androphy, whose communications Cross & Bennett already have.

requires the disclosure of the requested communications.[13]  And the communications Cross & Bennett rely upon were neither made in connection with a judicial proceeding, nor are Plaintiffs seeking to use them in this judicial proceeding for any purpose that would implicate the privileged communications Cross & Bennett seek.

Cross & Bennett argue that Plaintiffs seek to use the communications at issue as evidence that Cross & Bennett were terminated for cause.  Yet, given a moment of thought, the absurdity of this argument is obvious.  Whether Cross & Bennett were terminated for cause is dependent on whether Cross & Bennett actually committed malpractice and ethical violations in the course of their representation of Plaintiffs – not on what Plaintiffs or their counsel *thought* at the time.  Cross & Bennett also complain that Plaintiffs attempted to "intimidate" them into forgoing their claim to attorneys' fees based upon opinions received from other counsel.  Whether the statements were an attempt to 'intimidate" Cross & Bennett is not relevant to any claim or defense in the case asserted by Plaintiffs.  Cross & Bennett have failed to articulate any valid reason that would support waiver in this case.

Further, extrajudicial disclosures of attorney-client communications cannot effect an implied waiver of all confidential communications on the same subject matter.  Cross & Bennett effectively admit this in footnote 12 of their Motion, but wrongly claim that "threatening Cross & Bennett with malpractice claims is clearly conduct within a litigation context."  Cross & Bennett cite no authority for this proposition.  The rule does not speak of waivers in "a litigation context", but rather waivers that occur "in a federal

_____

13 Though Cross & Bennett fail entirely to cite to the rule, the test they seek to apply here is the one laid out in Fed. R. Evid. 502(a) which governs subject matter waivers associated with disclosures in federal proceedings, and supersedes all prior case law for such disclosures.  As discussed herein, the disclosures at issue were not made in connection with a federal proceeding, and therefore 502(a) does not apply.  But even if it did, the result would be no different as the third prong of the test in 502(a), fairness, is not met in this case.

proceeding." *See* Fed. R. Evid. 502(a).  Cross & Bennett's logic is that a "federal proceeding" has begun the very first time a party comes to believe it has a claim.  This cannot be true.  The statements at issue were clearly not made in a federal proceeding.[14] As a result, there can be no subject matter waiver.  This is consistent with the case law in the First Circuit.

In *XYZ Corp. v. United States (In re Keeper of the Records)*, 348 F.3d 16, 24 (1st Cir. 2003), the First Circuit held that subject matter waivers are limited to disclosures made during judicial proceedings.  "Virtually every reported instance of an implied wavier extending to an entire subject matter involves a judicial disclosure.  This uniformity is not mere happenstance; it exists because such a limitation makes eminently good sense." *Id.* at 17.

The only exception to this rule in the First Circuit occurs when a litigant injects the extrajudicial disclosure into a judicial proceeding.  *In re Keeper of the Records*, 348 F.3d at 25; *see also Columbia Data Prods. v. Autonomy Corp. Ltd.*, 2012 U.S. Dist. LEXIS 175920 at *51-52 (D. Mass. Dec. 12, 2012).  Cross & Bennett argue that Plaintiffs have done so here, using Mr. Thorpe's statements "to support Thorpe's contention that he had cause to fire Cross & Bennett and that he had not discharged them in bad faith to avoid paying the contingency fee."  Cross & Bennett's Memorandum in Support, p. 19.  But this is simply not the case.  Plaintiffs had cause to fire Cross & Bennett because Cross & Bennett *actually* committed malpractice and ethical violations

---

14 If the statements were made in a "federal proceeding," then Fed. R. Evid. 502 would govern the scope and extent of any waiver.  As discussed above, that would not avail Cross & Bennett here.

against Plaintiffs, not because Mr. Thorpe *accused* them of doing so. Plaintiffs have not, and are not, arguing otherwise. [15]

The statements at issue here were made long before the complaint in this case was filed. Plaintiffs have not and are not relying upon them to support their claims and defenses in this case. There is no subject matter waiver.

## CONCLUSION

Cross & Bennett have failed to meet any of the standards applicable to the forms of waiver they have asserted, and their Motion should be denied.

Respectfully Submitted,


_____/s/ Alex P. Basilevsky_____
William J. Leonard (*Pro Hac Vice*)
Richard P. Limburg (*Pro Hac Vice*)
Michael F. Eichert (*Pro Hac Vice*)
Alex P. Basilevsky (*Pro Hac Vice*)
H. David Seidman *(Pro Hac Vice Forthcoming)*
OBERMAYER REBMANN
MAXWELL & HIPPEL LLP
1617 John F. Kennedy Blvd.
Philadelphia, PA 19103
215-665-3000

Matthew J. Fogelman (BBO #653916)
FOGELMAN & FOGELMAN LLC
100 Wells Avenue
Newton, MA 02459
617-559-1530
mjf@fogelmanlawfirm.com

---

15 And Plaintiffs respectfully suggest to the Court that Cross & Bennett cannot circumvent the First Circuit's ruling in *In re Keeper of the Records* by injecting the communications into the case themselves. That would make a mockery of the First Circuit's decision.

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2013, this document (filed through the ECF system) will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.


/s/
Alex. P. Basilevsky